## Court of Appeals.

December 12, 1893.

### PEOPLE v. MATTHEW JOHNSON.

(55 St. Rep. 783; 140 N. Y. 350.)

1. Evidence—Homicide.

On the trial of an indictment for murder in the first degree, sketches made by an artist, showing the locality of the blood stains in and about the place of the murder, shown to be accurate by the testimony of the persons who made them, are admissible in evidence.

2. Witness—Examination.

The language may be given on cross-examination, from which the witness drew the conclusions to which he testified on the direct examination.

3. Trial—Charge.

The court may refuse to charge a request, where the first proposition is untrue and the other will eliminate the oath and responsibility of the jury. So held where, on the trial of an indictment for murder, the evidence connecting defendant with the crime was wholly circumstantial and the court refused to charge on request that direct evidence is always the most satisfactory, and that the jurors should be convinced as jurors when they would be convinced as men, and should doubt as jurors when they would as men.

Appeal from the judgment of the New York general sessions, entered upon verdict convicting defendant of the crime of murder in the first degree.

Vol. XI—1

T. McCants Stewart, for appellant.

H. B. B. Stapler, for respondent.

FINCH, J.—The death, and the violence which caused it, alleged in the indictment, were proved in this case by direct evidence as the law now requires, and were put beyond controversy by the finding of the dead body, with the marks of murder upon it. But the guilt of the prisoner as the perpetrator of the crime was established, as it may be, by evidence wholly circumstantial in its character. It is assailed on this appeal as being equivocal and inconclusive, consistent with a possibility of innocence, and not strong enough to justify the verdict founded upon it. We have read it and reflected upon it with the care and deliberation due to the extreme gravity of the inquiry, but without finding any reason to doubt or distrust the conclusion reached by the jury. A sufficient and adequate motive for the crime, consisting of revenge for a supposed injury, and supplemented by a desire to obtain the money known to have been paid to the deceased and which was stolen from his person; a convenient and presumably safe opportunity arising from the prisoner's familiarity with the premises, his knowledge of a place in which to hide until all the occupants of the building had departed after their usual habit, and leaving the engineer alone and unprotected while closing the premises and preparing for his own departure; the presence of the tools and instruments sufficient to effect the killing, the existence and locality of which were well known to the prisoner, and which were found near by, with blood and hair upon them; the track of the murderer from the basement to the washing closet on the fourth floor, shown by the bloody finger marks on the doors passed in the ascent and the stains upon the towel used in an effort to efface the marks which the struggle had left upon him; the theft of the black trousers left on the same floor, and which on the next day, were found in the possession of the prisoner, who sought to dispose of them to others; his display immediately after the killing of an amount of money, and in denominations closely corresponding to that which was taken from the pockets of the deceased, coupled with the fact that before the killing the prisoner was penniless, unable to pay his rent, bor-

rowing small sums where he could, out of work and earning nothing, and pawning his clothing to relieve his want; his manifest falsehood as to the source from which he obtained the money, his effort to frame and prove a false defense of absence in New Jersey on the day of the homicide; the blood stains on the clothing and shoes that were worn on that day; his attempt to avoid and escape arrest when the crime became known and suspicion was aroused; the fact that while offering himself as a witness and protesting with a vehemence almost amounting to blasphemy that he was innocent, he nevertheless gave no explanation of his possession of the stolen trousers, or of the money which he had displayed, but remained utterly silent where explanation was easy and imperative if innocence existed; all these incriminating facts, surrounded by and imbedded in others of less importance, point so surely to the prisoner as the author of the crime, and so exclude any other rational explanation as to compel our concurrence with the verdict of the jury. Their probative force lies largely in their combined and aggregate strength, each separate fact leading to and received from all the others a conclusiveness beyond its own. Some of them, alone and severed from their place in the sequence of the proof, have been criticised in the prisoner's behalf, but are open to such criticism only in respects which are technical rather than substantial, and remain practically unaffected by it.

Thus it is said that the proof of blood stains upon the prisoner's clothing lacked the necessary certainty, in view of the evidence that they might have come from the market in which he was in the habit of playing, and where the blood of animals was dripping; and that the expert called by the prosecution refused to swear positively that the stains were human blood. I doubt if any scientific ability can surely and with absolute certainty distinguish between the blood corpuscles of man and of some animals, under all circumstances. And it rather strengthens confidence in the opinion which Dr. Edson did express, that he refused to turn it into a positive assertion, and left it to stand as his judgment that the uniformity in size corresponding with that of human blood corpuscles, which characterized the stains examined, indicated that the latter were not

caused as the blood of other animals. Nobody saw, nobody observed these stains before the afternoon of the murder, so far as the record shows, and that they were occasioned by human blood is indicated with, at least, a high degree of probability which is entitled to greater weight when put in connection with the other proof.

Again, it is urged that the prisoner's expressions of malice toward the deceased were long before the killing, and followed by apparently friendly relations. That is true, but such relations continued only down to the time of his discharge, and after that the only direct proof we have which brings the two men together at all is that of the prisoner's concealment on the premises, the vicious motive of which the deceased evidently suspected. And the prisoner's animosity against the man whom he believed had occasioned his discharge might easily have resumed its influence and become intensified when want of money and of work and the bitterness of absolute poverty revived its memory; and when to that is added the temptation of robbery adequate motives are shown, so far as such motives can be said ever to be adequate.

It is further urged that the money which the prisoner displayed was not absolutely identified as that which was paid to the deceased on the day of his death. That also is true, but it does not weaken the facts that just before the killing the prisoner had no money, and no means of obtaining any, and was in distressing need of it, and immediately after the murder had in his possession almost exactly the amount paid to the deceased, and in the same denominations of currency, and that his explanation of where and from whom he got it was unquestionably false.

There was no error in permitting the drawings representing the premises to be put in evidence. They were not photographs, but sketches made by an artist showing the locality of the blood stains in the basement and on the doors above. He swore to their accuracy from his own personal knowledge and observation. The learned trial judge was extremely careful about them. He required explicit proof of their accuracy, and where descriptive words were marked upon them stood ready to strike off any to which reasonable objection should be made. They

served only to explain localities, and their accuracy was satisfactorily shown.

Nor was there error in admitting what is here criticised as being hearsay evidence. The witness Sawyer, when examined by the counsel for the prisoner as to an interview with Seay, was asked if the latter said that he came from Johnson, to which the witness replied in the affirmative. The answer involved his construction of what Johnson said to him, and indicated some sort of authority, or some requested action on the part of the latter, which, if disclosed, would explain or limit the answer. The prosecutor asked what it was that Seay said, or, in substance, what language he used in conveying the idea that "he came from Johnson." The prisoner's counsel had drawn out that statement, and the prosecutor had the right to know the words which Seay used in making it. The door was opened to that extent at least, and the question and answer involved no error.

The charge of the court to the jury was careful, just and fair, so much so that no exception was taken to it; but it was followed by a large number of requests to charge, most of which were granted, and a few only refused. That refusal in most cases was because the requests had already been covered by the charge, but in some because the propositions were erroneous. Thus there was a request to charge that direct evidence is always the most satisfactory, and that the jurors should be convinced as jurors when they would be convinced as men, and should doubt as jurors when they would doubt as men, each of which propositions sets up an unsafe and inaccurate standard by which to guide the judgment. The one is untrue and the other eliminates the oath and the responsibility of the jury.

I am unable to see any ground upon which the judgment against the prisoner should be reversed. The trial was fair and conducted with a careful regard for the rights of the accused; the judge presiding evidently realized that the prisoner was a helpless colored boy, without friends or money, and so entitled to have every possible right preserved with more than the usual care; the attorney who defended him at the trial did so faithfully and with all the resources at his command, and on the argument here the accused was represented by a counsel of his

own race, who argued the case with courage and zeal and a professional ability worthy of commendation. We cannot see that any mistake has been made or any injustice been done, and so are compelled to decide that the verdict must stand.

The judgment should be affirmed.

All concur.