Argued 30 January; decided 8 April; rehearing denied 6 May, 1901.

## ALDRICH *v.* COLUMBIA RAILWAY COMPANY.

[ 64 Pac. 455.]

DETERMINING PROPRIETY OF EXPERT TESTIMONY.

1.   When expert testimony is offered, it is the duty of the judge to determine preliminarily whether the subject of inquiry is one about which experts may properly give opinions, and the action of the judge therein is reviewable.

DUTY OF DETERMINING QUALIFICATIONS OF ALLEGED EXPERT.

2.   Before allowing a witness to testify as an expert the judge should determine from the evidence offered whether the witness is competent.

APPEAL—OBJECTION TO COMPETENCY OF WITNESS.

3.   An objection to the competency of a witness offered as an expert can not first be urged on appeal—that is one of a class of points that is waived unless raised at the trial.

SUFFICIENCY OF EVIDENCE OF USAGE.

4.   Although Section 778, Hill's Ann. Laws, requires the testimony of at least two witnesses to prove usage, the evidence of only one witness is not incompetent so as to make its admission reversible error, where no request that the evidence be withdrawn or that the jury be instructed to disregard it has been made and refused.   The testimony may have been insufficient, but it was not for that reason incompetent.

CONTRACT TO GRADE RAILROAD—COMPETENT EVIDENCE OF USAGE.

5.   In an action to recover an alleged contract price for grading a railroad, where the dispute was as to whether, by usage, the expression "straight cut and fill," contemplated payment for material taken from cuts, and another payment for the same material placed in fills, or but one payment for one handling of the material, evidence to show that it was customary for railroads in that locality to make contracts providing for but one payment, where the same material taken

from cuts was used in fills, was irrelevant, since the evidence offered did not relate to the meaning of the term "straight cut and fill," but to the general custom of drawing contracts, which was not in issue.

DEPOSITIONS—RESERVED OBJECTIONS.

6. Where depositions are taken in pursuance of a stipulation that the answers to the interrogatories may be offered in evidence subject to objections at the trial that they are incompetent, irrelevant, or immaterial, they are open to any objection at the trial which might have been taken to the testimony of the deponent if he had been called as a witness.

RIGHT OF SURETY COMPANY TO EXECUTE ATTACHMENT BOND.

7. Under Hill's Ann. Laws, § 3282,* permitting surety companies to become surety on the bond or undertaking of any person or corporation required by law to execute a bond or undertaking, a surety company is a sufficient surety on an undertaking for an attachment for such act impliedly amends Section 146 of Hill's Ann. Laws, prescribing the qualifications of sureties.

DISSOLVING ATTACHMENT FOR INSUFFICIENT UNDERTAKING.

8. Where an undertaking for attachment has been filed on a claim of several thousand dollars, and the surety has justified in a sum that is about $3.00 too small, a motion to dissolve the writ because the justification was not in a sufficient sum should be overruled, since it is apparent that an honest effort was made to execute a proper undertaking, and the law does not concern itself with trifles.

PRESUMPTION OF INJURY FROM ERROR.

9. In an action on a grading contract, where the matter in issue was whether the expression, "straight cut and fill," entitled the plaintiff to payment for taking material from a cut, and payment again for placing the same material in a fill, or only one payment for one movement of material, evidence that the work was unusually hard, and that labor was difficult to obtain, was immaterial, and the admission of such testimony is sufficient ground for reversal on appeal, even when it is not specified that it was prejudicial: *Cleveland Oil Co.* v. *Norwich Ins. Soc.* 34 Or. 228, and *Carney* v. *Duniway*, 35 Or. 131, followed.

From Multnomah : ALFRED F. SEARS, JR., Judge.

This action was commenced by Stephen W. Aldrich against the Columbia Southern Railway Company in Wasco County, November 18, 1898, to recover money alleged to be due for grading done on the right of way for a railroad. It is averred in the complaint that plaintiff entered into a contract with the defendant, a corporation, whereby it agreed to pay him sixty-seven and one half cents per cubic yard for all earth or stone removed

---

* NOTE.—Section 3282, Hill's Ann. Laws, was distinctly repealed by the act of 1899 providing the conditions on which surety companies may transact business in Oregon, but its substance is included in section 6 of the new act: Laws, 1899, pp. 193, 195.—REPORTER.

from cuts, and the same price for each cubic yard of said material placed in fills, in grading a part of its line of railway ; that in pursuance of such agreement he excavated and filled seventeen thousand seven hundred and forty-four cubic yards of said material, amounting to $11,977.20, on account of which the defendant had paid him only the sum of $6,686.01. As a further cause of action, it is alleged that, in pursuance of a special agreement entered into with the defendant, he performed other work and labor, for which it promised to pay him the sum of $329.80, but had neglected to do so, and judgment is demanded for the sum of $5,620.99, with interest thereon from November 15, 1898. The plaintiff having filed an affidavit for an attachment, and given an undertaking therefor in the sum of $5,620, with the name of the United States Fidelity & Guaranty Company, a corporation, as surety, subscribed thereto by C. E. Bayard, whose appended affidavit shows that he is agent and attorney in fact for said surety, which had complied with the act of February 26, 1895, and was worth the sum of $11,220 over and above all debts and liabilities, exclusive of property exempt from execution, a writ of attachment was issued, in pursuance of which the defendant's property was attached as security for any judgment that might be obtained in the cause. The defendant's counsel moved the court to dissolve the attachment on the ground that the undertaking therefor was not executed by a competent surety, that the bond did not comply with the statutory requirement in that the amount thereof was too small, and that the surety did not justify in a sufficient sum. This motion having been overruled, the court, at the defendant's request, transferred the cause to the circuit court for Multnomah County, where an answer was filed denying the material allegations of the first cause of action, and alleging that the contract entered into with the plain-

tiff stipulated for the payment of sixty-seven and one half cents per cubic yard for all material taken from cuts made · by him in grading a portion of its right of way, and that he would make no charge for fills to be made with earth or stone taken from said cuts, provided said fills should be within the distance of three hundred feet from the cuts, and that when the fills were at a greater distance he was to receive one cent per cubic yard for each additional one hundred feet that said material might be hauled ; that plaintiff was entitled only to the sum of $2,885.22, which it had been ready and willing at all times to pay ; and tendered a judgment for that sum. A reply having put in issue the allegations of new matter in the answer, a trial was had, resulting in a judgment for plaintiff in the sum of $4,252.61, and the defendant appeals.

REVERSED.

For appellant there was a brief over the name of *Snow & McCamant,* with an oral argument by *Mr. Wallace Mc-Camant.*

For respondent there was a brief over the name of *O'Day & Tarpley,* with an oral argument by *Mr. Thos. O'Day.*

MR. JUSTICE MOORE, after stating the case, delivered the opinion of the court.

The controversy involved herein relates to the terms of the agreement entered into by the parties hereto. Plaintiff's counsel contend that he was to receive sixty-seven and one half cents for each cubic yard of material removed from cuts, and the same sum per cubic yard for placing it in fills ; while defendant's counsel insist that he was entitled to only one payment for one movement of the same material, and that when he took

material from a cut, and used it in making a fill, he was to be paid only sixty-seven and one half cents per cubic yard therefor. The transcript shows that, after some preliminary correspondence between the plaintiff and certain officers of the defendant company respecting the character of the grading to be done, he called upon D. C. O'Reilly, its general manager, and made two bids, one denominated "straight," and the other "classified," for the grading of a part of its right of way, and thereupon submitted the following memorandum evidencing his said offer, to wit: "70c. per yard straight cut and fill, or 90c. for solid rock and 35c. for loose rock." O'Reilly testified that when this bid was made he said to the plaintiff, in referring to the language used in the memorandum: "That does not mean, of course, that you are asking for the straight measurement of the yardage; you do not expect pay for moving the same material twice, where the material from the cut will go to make the fill;" to which he replied, "No." The plaintiff, however, denies that any such conversation ever occurred. The defendant offered testimony tending to show that the word "straight" is commonly used in railway construction as contradistinguished from "classified;" that a straight bid is an offer to move material for a stated sum per yard, regardless of classification; that a classified bid is an offer to perform the same work for a stated sum for each of two or more kinds of material handled; and that the first proposal made by plaintiff was a straight, and the second a classified, bid. Neither of plaintiff's bids was accepted, but a few days after they were made he met O'Reilly, who informed him that the defendant could do the grading for less money than he proposed, and thereafter the plaintiff, having a conversation over the telephone with E. E. Lytle, the president of the company, was informed by him that an unclassi-

fied bid would be considered; whereupon the plaintiff offered to reduce his straight bid for the performance of the work to sixty-seven and one half cents per yard, and Lytle, on behalf of the defendant, sent him a telegram of which the following is a copy: "Will give you contract at sixty-seven and half, as talked. When will you be on the ground?" The defendant's evidence tends to show that on the next day after receiving this telegram plaintiff had another conversation over the telephone with Lytle, who informed him that it was not necessary to go to Wasco to execute a written agreement; that ·a contract similar to that adopted by the Oregon Railway & Navigation Company for grading its roadbed would be prepared and sent to him for his signature; and that plaintiff, knowing the terms of the contract proposed, and being satisfied with the stipulations thereof, agreed to be governed by its conditions in the performance of the work. The plaintiff, however, as a witness in his own behalf, denied that he ever had any such conversation. The defendant offered in evidence a skeleton of a contract which it was claimed was similar to that used by the Oregon Railway & Navigation Company in evidencing agreements for grading rights of way, and Lytle testified that he submitted the same to plaintiff for execution if its terms were acceptable to him, or, if they were unsatisfactory, the form so submitted could be used as a guide to prepare a contract therefrom, but that none was ever executed. The uncontradicted testimony shows that the contracts of the Oregon Railway & Navigation Company all provide for but one payment for one movement of material in grading its right of way, and that when material is taken from a cut, and used in making a fill in grading, yardage is calculated but once.

We have given a brief epitome of the testimony introduced at the trial, not for the purpose of commenting

upon its weight,— for that was a question for the jury to determine,— but to illustrate the issue involved, and as a basis for the inquiry whether the agreement entered into between the parties, as contended for by the plaintiff, was established in the manner prescribed by our statute. The plaintiff's counsel, when their client was on the stand as a witness in his own behalf, referring to the memorandum bids which he submitted to the defendant's agent, propounded to him the following question : '' These words, 'straight cut and fill,' have they special signification in contracting for grading?'' to which the witness, without objection, replied, '' Yes, sir.'' The bill of exceptions states that this was the only testimony tending to show that the words adverted to had any technical meaning in railway construction. The plaintiff also testified on cross-examination that in all his experience as a railway contractor he had heard or known of only two cases besides the one at bar in which a contractor had received double compensation for the movement of material from a cut to a fill ; that one instance was a contract for the grading of a portion of the North Pacific Coast Railway in California, and the other for the construction of a section of the Oregon Railway & Navigation Company in this state ; and that he had no personal knowledge of the latter contract, his information upon the subject having been derived from a statement to that effect made to him by one E. J. Jeffery. Jeffery, having been called as plaintiff's witness, testified to the effect that, in the absence of a stipulation in a contract, a person agreeing to grade a railroad was not to be paid for fills made from material taken from cuts ; the usage in railroad parlance would convey the meaning that payment was to be made for the fill as well as for the cut ; whereupon the following interrogatory was propounded to him : '' But in the absence of a written statement that a party was not to be

paid for fills made from material out of the cuts, in the absence of written explanation, what would you say as to its being the rule or usage to pay for both cut and fill?" An objection to the question, on the ground that it was incompetent and immaterial, having been overruled, an exception was allowed, and the witness answered : "It would convey the meaning that it meant without any written agreement that he was to be paid for the fill the same as he was for the cut." It is contended by defendant's counsel that the plaintiff's experience as a railroad contractor was insufficient to enable him to express an opinion respecting the meaning of the words, "straight cut and fill," or to state that they had a technical signification, and, this being so, evidence of usage was inadmissible to prove their meaning, and hence the court erred in overruling said objection, and that, in any event, usage could not be established by the testimony of one witness.

1. Considering the admissibility of expert testimony, it may be said that, when a witness is offered as an expert, the preliminary question to be considered is whether the subject-matter of the inquiry sought to be elucidated is such that it lies without the domain of common experience of men possessing an ordinary education, and this question the court must determine as a matter of law, and any error committed therein is reviewable : *Nutt* v. *Southern Pac. Co.* 25 Or. 291 (35 Pac. 653); *Campbell* v. *Russell*, 139 Mass. 278 (1 N. E. 345).

2. This question having been answered in the affirmative, the next inquiry is whether the witness offered possesses requisite skill or knowledge of the subject-matter under consideration to enable him to express an intelligent opinion thereon, which question is one of fact, and

must be determined by the court from a consideration of the evidence offered touching his qualification : *Sowden* v. *Idaho Quartz Min. Co.* 55 Cal. 450.

3.    Much contrariety of opinion exists upon the question as to whether an appeal lies from the court's decision upon this branch of the inquiry, but, in any event, before an appellate court can review a decision of this character, counsel for the adverse party must object to the testimony of the witness offered on the specific ground that he is incompetent; for if this question has not been called to the attention of the trial court at the proper time, and in an appropriate manner, it will not be considered on appeal : *State* v. *Cole,* 63 Iowa, 695 (17 N. W. 183); *Hand* v. *Brookline,* 126 Mass. 324. `No objection was interposed to plaintiff's testimony when it was offered, on the ground that he was incompetent to give an opinion respecting the technicality of the words "straight cut and fill," nor was any motion made to strike out such testimony when, on his cross-examination, it appeared that he had but little experience in grading railroads under contracts providing for straight cuts and fills, and possessed but little information concerning contracts containing such words, and, in the absence of such objection or motion, the plaintiff's testimony must be deemed competent upon that subject; for the rule is that, if the competency of a witness to testify as an expert is not raised in the lower court, it can not be raised for the first time in the supreme court : *Robinson* v. *Marino,* 3 Wash. 434 (28 Pac. 752, 28 Am. St. Rep. 50).

4.    Our statute provides that usage shall be proved by the testimony of at least two witnesses : Hill's Ann. Laws, § 778.  The object of this section is to prescribe the quantum of evidence necessary to prove a particular fact.  If

it be considered that Jeffery's testimony was all that was introduced by plaintiff respecting the meaning which usage by railway contractors and engineers had ascribed to the words "straight cut and fill," when used in a contract for grading a railroad, the objection interposed to the testimony of the witness is insufficient to present the question now insisted upon ; for, while the statute has designated the number of witnesses whose testimony is deemed sufficient to prove usage, a party may certainly dispense with the measure of proof so provided. If the court had been requested to withdraw Jeffery's testimony, or to instruct the jury to disregard it, and had refused to grant the request, an exception to its action would have reserved the question insisted upon ; but, not having done so, no error was committed in the particulars complained of.

5. The defendant called A. E. Hammond, C. M. Redfield, E. E. Cooper, J. E. Newell, and J. C. Havely, each an experienced civil engineer, who testified, in effect, that he was acquainted with the custom prevailing on the Pacific Coast in the manner of drawing contracts for grading railroads, and knew the mode of performing the work done in pursuance thereof, and that there existed in said section a well-settled custom in forming such contracts respecting the payments to be made for fills constructed from material taken from cuts. The defendant's counsel thereupon sought to prove, by appropriate questions addressed to each of said witnesses, that a uniform custom prevailed in the Northwestern states, in letting contracts for railway construction, to pay only one price for one movement of material, and in no case to pay for fills made from material taken from adjacent cuts, which custom was so general and uniform, and had existed for such a length of time, that it must have been known by

the parties to the contract herein at the time it was entered into. An objection to these questions having been sustained on the ground that they were incompetent, irrelevant, and immaterial, and that proof of usage was inadmissible to limit .or vary the terms of an express agreement, an exception was allowed, and it is contended that the court erred in excluding the testimony so offered.

It would appear from an inspection of the transcript that plaintiff's theory of the case is that, in the conversation he had with Lytle over the telephone, he, in effect, changed the number and character "70" in the memorandum to "67½ cents," leaving the words, "per yard straight cut and fill," intact therein, and that Lytle's telegram, "Will give you contract at sixty-seven and half, as talked," was an acceptance of such offer, showing an *aggregatio mentium*, thereby consummating their agreement. The defendant's theory seems to be that plaintiff stated to its agent that his memorandum offer did not mean double compensation for a single movement of earth or rock ; that the evidence shows that a "straight" or "unclassified" bid is an offer to take material from a cut, and place it in the grade, at a uniform price per cubic yard, regardless of the character of such material, and that plaintiff, in pursuance of Lytle's telephone message that an unclassified bid would be considered, reduced his "straight" bid, whereupon Lytle wired him an acceptance of the offer "as talked ;" and that these facts show an agreement to cut and transport the material at one price for one movement thereof. It will be observed that these respective theories present separate contracts, essentially dissimilar, and it was for the jury to say by their verdict which of these theories was established by a preponderance of the evidence. Any evidence, therefore, that reasonably tended to prove the theory of either party, was

39 OR.—18.

material and admissible under the pleadings. It will be remembered that the question propounded to the several witnesses did not relate to the meaning which usage by civil engineers had given to the word "straight," when adopted by parties in the terms of a contract for grading a railroad, but to the general custom of drawing contracts, which was not an issue. If the witnesses had been permitted to answer the question and to prove the existence of the usage, it would not have established the measure of compensation agreed upon, but would only tend to prove the improbability of the defendant's assenting to the terms of a different contract, by which means, if it were the rule of law, a party in most instances might escape the consequences of his carelessness whenever his ventures proved unprofitable. The fact that other railway companies do not ordinarily make such contracts does not tend to prove that the defendant did not assent to the agreement as alleged by plaintiff, and, this being so, no error was committed in rejecting the testimony so offered.

6. The defendant, in pursuance of a stipulation, took E. E. Cooper's deposition, which was received in evidence without objection. But after it was read the court, upon motion of plaintiff's counsel, permitted them to withdraw the following cross-interrogatories propounded by them, and the witness' answers thereto, as follows: "Int. 4. Are not contracts made whereby a contractor is paid for both cuts and fills? A. I have already stated that I know of one such contract. Int. 5. Is it not a fact that the circumstances and the prices are usually taken into consideration as to whether a contractor is paid for both cuts and fills? A. Inasmuch as such contract is out of the ordinary way of awarding contracts, I do not know what may or may not be considered." An exception having

been saved to the court's action in this respect, it is contended by defendant's counsel, that an error was committed in excluding this evidence. The order allowing its withdrawal was evidently based upon the ground that the answers so excluded tended to prove a usage, the evidence of which was inadmissible to vary the terms of an express agreement, and as the court, prior thereto, upon motion of plaintiff's counsel, had rejected corroborative testimony upon the same subject and for like reason, a consistent course in the trial of the cause necessitated the action to which exception was taken. The stipulation entered into between the parties respecting the taking of said deposition provided that the deponent's answers to the interrogatories might be offered in evidence, subject, however, to the objection, which might be insisted upon at the trial, that they were incompetent, irrelevant, and immaterial.

An objection to a deposition, on the ground that a deponent's statement therein is not legitimate evidence, ought generally to be made when the deposition is taken, but such objection may sometimes be made at the trial: *Covey* v. *Campbell,* 52 Ind. 157 ; *Myers* v. *Murphy,* 60 Ind. 282. The parties hereto having reserved the right to interpose objections at the trial for the reasons specified, the deposition, when produced, was open to any objection that might have been taken to the testimony of the deponent if he had been called as a witness : Weeks, Dep. § 391. The evidence so excluded was, in our judgment, immaterial, and hence inadmissible, for the reason assigned in the rejection of the testimony of the engineers called to prove usage in respect to the manner of drawing contracts, and no error was committed in permitting such withdrawal of the cross-interrogatories and the answers thereto.

7.   It is contended that the court erred in not dissolving the attachment for want of a sufficient undertaking therefor.   Our statute, as far as deemed material herein, provides, in substance, that, before a writ of attachment can be issued, the plaintiff shall file with the clerk an undertaking, with one or more sureties, in a sum not less than $100, and equal to the amount for which judgment is demanded, and that no person not qualified to become bail upon an arrest is qualified to become surety in an undertaking for an attachment: Hill's Ann. Laws, § 146.   The qualifications of bail are that each of them shall be a resident and householder or freeholder within the state, and worth the amount specified in the writ of arrest:  Hill's Ann. Laws, § 118.   It will be remembered that the action was commenced November 18, 1898, to recover the sum of $5,620.99, with three days' interest.   The rate of interest in this state at that time on such demands was six per cent (Laws, 1898, Sp. Sess. p. 15), and hence the amount for which plaintiff demanded judgment was $5,623.80, or $3.80 more than that for which the undertaking was given.   The affidavit of the surety attached to the undertaking shows that it was worth the sum of $11,220, when it should appear therefrom that it was worth $11,247.60.   It will also be remembered that the motion to dissolve the attachment was based on the following grounds :  (1) That the undertaking was not executed by a competent surety ;  (2) that the amount thereof was too small ;  and (3) that the surety did not justify in a sufficient sum.   The law in force when the undertaking was given permitted any surety company, on the production of evidence of its solvency and credit satisfactory to the judge, court, head of department, or other officer authorized to approve any bond or undertaking, to become surety upon the bond or undertaking of any

person or corporation required by the laws of this state
to execute a bond or undertaking : Hill's Ann. Laws,
§ 3282.  We think this section broad enough to authorize
a surety company to become a surety on an undertaking
for an attachment, notwithstanding it may seem to
enlarge, by implication, Hill's Ann. Laws, § 146, in
respect to the qualifications of such sureties.

8.  That the amounts specified in the undertaking and
in the justification of the surety are too small must be
conceded ; but it appears that plaintiff had made an
honest effort to execute a proper undertaking, and, this
being so, the deficiencies to which attention has been
called are so insignificant, when compared with the
amount for which the undertaking was given, that they
may be disposed of under the maxim, *de minimis non
curat lex.*

9.  The plaintiff, when a witness in his own behalf,
was directed to ''state to the jury the nature and char-
acter of the work performed there generally, as to what
it was, rock or loose rock, or what the facts were ;'' to
which the defendant's counsel objected on the ground
that the contract provided for the performance of, and
the payment for, the work, without any classification,
and hence such testimony was immaterial ; but, the objec-
tion having been overruled, and an exception allowed,
the witness made the following statement : ''When I
went up there and looked over that work, I found out that
they had scraped off all the loose material that they could,
and undertook to plow over the rock, and could not do
it.  The only place that I was deceived in the work at
all was in one cut, where I found lots of what we call
'nigger heads'—that is, they are from the size of hen's
eggs up to a bushel basket—around in the rock.  Of

course, in drilling around, when I struck one of them I could go no further. It was what we call 'scab rock'; that is, it was little bits of columns, pointing into the bank, and it was hard to drill, and came out in blocks about that long (illustrating), and sometimes wider and square. It would be almost impossible to drill into that kind of seams. You could not turn the drill. You could go on and drill for ever so long, and get very little results ; but it is deeper here, and with the same kind of drill and powder you could get ten times that much result. I was not deceived as to the character of that, only in this one point.'' Defendant's counsel thereupon moved to strike out this testimony, on the ground that it was not responsive ; but, this motion being denied, an exception was saved. The witness was then asked the following question : ''You may state what conversation you had with Lytle or Mr. O'Reilly just prior to making this bid, as to what you would have to pay for the labor. What was said in that regard? Just state the conversation.'' An objection to this interrogatory, on the ground that the testimony sought to be elicited was immaterial, having been overruled, and an exception allowed, the plaintiff answered : ''I told them that the labor market was such that I would have to pay more. At that time labor was worth $1.50, and before I got through it was forced up to $2.00 a day. To undertake to go up there to do that piece of work, and send men up there, and they had to pay one cent a mile from here to Biggs, which is, I think, eighty-eight miles, or something like that,—yes, eighty-eight miles,—in the face of other contractors on this line getting their men passed for nothing. The hot weather we had to contend with, and right during harvest time, when men would leave me and go to harvesting,—that I could not think of taking the work for any less. I sent to Astoria, and got twenty-two men, which cost me $122

to lay the men down to do the work, and three days after there were only three men left. It was one hundred and thirteen in the shade, and men lying in the camp sick and vomiting. They could not work. That was the condition under which I bid.''

It is contended by defendant's counsel that an error was committed by the court in the admission of this testimony; but plaintiff's counsel maintain that, if the testimony was immaterial, the defendant was not injured thereby, unless it was prejudicial, and, not having specified that the testimony was prejudicial, any error committed in this respect is not subject to review. We think otherwise, however; for the rule is well settled in this state that, while error will not be presumed, yet, when it appears from the transcript, there is no presumption that it was rendered harmless or obviated during the trial, while the record is silent : *Du Bois* v. *Perkins,* 21 Or. 189 (27 Pac. 1044); *Nickum* v. *Gaston,* 24 Or. 380 (33 Pac. 671, 35 Pac. 31); *Cleveland Oil Co.* v. *Norwich Ins. Soc.* 34 Or. 228 (55 Pac. 435); *Carney* v. *Duniway,* 35 Or. 131 (57 Pac. 192, 58 Pac. 105). We can see no reason for the admission of this testimony, unless it was to rebut any inference that the contract entered into between the parties provided for one payment for one movement of the material, and as the grading was heavy, and the difficulty of procuring labor great, it was improbable that the plaintiff should have entered into such a contract as the defendant contends for. For the error committed in this respect, the judgment must be reversed, and a new trial ordered, in view of which we have discussed the questions hereinbefore considered, as they are likely to occur on a new trial.                                   REVERSED.