Argued 23 July, decided 20 August, 1907.

## STATE v. REMINGTON.

91 Pac. 473.

CRIMINAL LAW—MAP AS EVIDENCE.

1. A map of premises under consideration, made by a disinterested competent person, is admissible in evidence, though made by one who did not find sundry articles shown to have been picked up at points marked on the map, where the persons who did find the articles say the map is correct and shows truly the location they refer to in their testimony.

ORDER OF PROOF—RENDERING EVIDENCE COMPETENT BY SUBSEQUENT TESTIMONY.

2. Incompetent evidence that is improperly admitted may be made competent by later testimony, and thereby the original error will be corrected, the order of proof being a matter of discretion.

MAPS DRAWN TO ILLUSTRATE A THEORY AS EVIDENCE.

3. A map on which is correctly delineated the premises referred to is not rendered incompetent because it has lines and marks intended to illustrate or support the theory of the party for whom it was made, the difference between the reality and the theory being properly explained.

EVIDENCE—EXPRESSING OPINION INSTEAD OF FACTS.

4. It is competent for a qualified witness to express an opinion as to the proper deduction to be drawn from the facts shown in evidence where they are of such a nature that they cannot be clearly placed before a jury disconnected from the conclusion of the witness.

A witness, first shown to be competent, may state, on a criminal trial, his opinion as to whether a 30-30 rifle would make a hole the size of the hole in a picket from a fence shown him, notwithstanding it was admitted that the shooting was done with a 30-30 rifle, and though the picket and the bullet which struck the complaining witness, but which was mashed and battered, were received in evidence, such testimony not being subject to the objection that the question was one which the jury was as competent as witness to determine.

ASSAULT WITH INTENT TO KILL—EVIDENCE OF EXTENT OF INJURY.

5. On a trial for assault with intent to kill a physician who attended the injured person may state the nature and extent of his injuries, since such evidence tends to explain the extent and nature of the attack and its purpose.

ASSAULT WITH INTENT TO KILL—INSTRUCTION ON SELF-DEFENSE.

6. On a trial for assault with intent to kill, it appeared that ill feeling had existed between the complaining witness and defendant, and that defendant knew that complaining witness had threatened to take his life and went armed for that purpose ; that defendant, having occasion to call on one who lived beyond complaining witness' farm, selected a route which took him across complaining witness' farm, but which route persons living in that vicinity had used without objection, and that defendant carried with him a rifle. *Held* to warrant a charge that one cannot claim self-defense if he inten-

tionally put himself where he knew he would have to invoke its aid, that if defendant could have avoided any conflict without increasing the danger to himself it was his duty to do so, and that if defendant sought the conflict, and the prosecuting witness showed fight and used a deadly weapon, or did an act in such a way as if about to engage in an affray, he could not invoke the law of self-defense until he had first retreated as far as he could with safety to himself.

From Marion: GEORGE H. BURNETT, Judge.

E. L. Remington appeals from a conviction of a charge of assault with intent to kill.          AFFIRMED.

For appellant there was a brief over the names of *Grant Corby, William Henry Holmes* and *Rauch & Senn,* with an oral argument by *Mr. Corby* and *Mr. Holmes.*

For the State there was a brief over the names of *A. M. Crawford,* Attorney General, *John H. McNary,* District Attorney, and *C. L. McNary,* with an oral argument by the District Attorney.

Opinion by MR. JUSTICE MOORE.

The defendant, E. L. Remington, was convicted of the crime of assault with intent to kill, alleged to have been committed in Marion County, November 22, 1906, by shooting and wounding one W. W. Slaughter, and appeals from the judgment which followed.

1. His counsel contend that an error was committed in admitting in evidence, over their objection and exception, a map of the *locus in quo* where the shooting occurred. B. B. Herrick, county surveyor of the county mentioned, testified that, pursuant to the district attorney's direction, he measured a part of Slaughter's land and made a plat thereof, which he identified, and upon which appear black lines indicating certain objects. Thus, in a small square on the map is written the phrase "Pig shed," and on the west side of the shed are two parallel lines, marked "Log 3 feet high." At the southwest corner of the shed is a small circle having a cross therein, and designated by the words "Point where shells were found." A garden is represented as being east of the pig shed, in which is another circle similarly marked, and indicated by the sentence "Point where plow lies." Two lines extend north and south, 29 and

124 feet, respectively, east of the pig shed, which are specified, in the order named, "Board fence 4 feet high" and "Picket fence 5 feet high." At a point in the palings last mentioned, in a direct line between the circles specified, is a cross, marked "Bullet hole in fence 3½ feet above ground." A trail is represented as extending southeasterly across Slaughter's land, the nearest line of which is about 122 feet south of th pig shed. A county road, extending north and south, is indicated on the map as being east of such premises, and across the highway are certain lines, marked "Pomeroy's house." All the objects thus specified, and others not mentioned, are represented by black lines. There are also on the plat certain red lines, in the broken parts of which appear numbers, indicating in feet the distance, respectively, from one object to another. Omitting these numbers, the red marks are as follows: One direct and two curved lines connect the circles hereinbefore mentioned. A line extends from the circle designating the point where the plow lies to Slaughter's dwelling, and from thence to Pomeroy's house. A line is drawn southeasterly from the pig shed to the trail, and another line also extends southwesterly from the point where the plow lies to a point in the picket fence. The objections interposed to the introduction of the map in evidence were based on the ground that no testimony had been introduced tending to show that the shooting had been done at any given point, and also for the reason that the red lines were made on the plat, at the district attorney's direction, to illustrate his theory of the case.

The state attempted to establish the fact, by the discovery of the three empty shells of the same caliber as the defendan'ts rifle, which parts of cartridges were found near the southwest corner of the pig shed, that Remington fired his gun from ambush behind the log indicated on the plat. The county surveyor was not present when the metallic cases were discovered, and the information which enabled him to note on the plat the words "Point where shells were found" was not derived from his personal observation of a material fact, but obtained from the declarations of others. In *Adams* v. *State*, 28 Fla. 511 (10 South.

106), the plaintiff in error was charged with the crime of murder in the first degree, and at his trial a map was offered in evidence, on which were delineated the route of a certain person and also the positions severally occupied by others. A verdict of guilty as alleged having been returned, judgment was rendered thereon, in reversing which the court say: "Ike Spanish did not take the map and trace the route in explanation of his testimony; neither did Sandy Sheffield mark on the map where he was, and where he saw Will Adams passing along; but it appears that Mr. Brown put these indications on the map. It also seems that the map was introduced in evidence after Spanish and Sheffield had testified. We think a map or diagram of the country in its physical condition at the time can be put in evidence, and any witness, in giving testimony as to localities, can indicate on the map the relative position of things or persons. But for a person who knew nothing of these matters, except what he heard from others, to designate the movements of persons on the map, would be testimony of a secondary character, and improper to be admitted." In the case at bar A. E. Pender testified that the morning after the shooting he found in the grass and ferns at a point about six or eight inches west of the log indicated on the map, and at the southwest corner of the shed, two "30-30" shells, and two days thereafter he discovered another shell of the same size about three feet southwest of where he found the others; and, his attention having been called to the map, he identified thereon the places and objects thus indicated. Referring to a bullet hole in a picket of the fence he further stated that the perforation in the paling was in a direct line between the places where the two shells were found and where the plow was left in the furrow. This witness stated on cross-examination that, from the place where he found the two shells, a person using a gun right-handed would have been behind the shed.

2. The order of proof is regulated by the sound discretion of the court (B. & C. Comp. § 842) ; and, though the map was received in evidence before Pender was called as a witness, his identification of the "point where the shells were found" ren-

dered the plat competent evidence, as illustrating his description of the premises: 4 Elliott, Evidence, § 3044; *Rowland* v. *McCown.* 20 Or. 538 (26 Pac. 853) ; *People* v. *Cassidy,* 133 N. Y. 612 (30 N. E. 1003).

Considering the respective theories of the district attorney and defendant's counsel, it is deemed proper to state the relation which existed between the prosecuting witness and Remington at the time the shooting occurred. Slaughter's wife had been divorced from him on the ground of cruel and inhuman treatment, in which suit he made no appearance. He blamed Remington, however, for his marital troubles, and had repeatedly threatened to take his life, to accomplish which he usually carried a revolver, occasionally exhibiting it, and declaring that he went thus armed to execute his purpose, which menaces had been communicated to Remington. Slaughter possessed the reputation, in the vicinity in which he lived, of being quarrelsome and desperate. The defendant's testimony is to the effect that he was engaged at Woodburn in selling firearms and other goods; that he left his place of business, November 22, 1906, in the afternoon, intending to call upon one George Killin, who lived in an easterly direction and beyond Slaughter's farm; that, thinking he might find some game on the way, he took with him, as was his custom, a gun, and, as he was passing on the shortest route along a trail generally used by the public across Slaughter's land, he observed some one moving, and, looking carefully, he recognized Slaughter approaching him in a threatening manner, armed with a shotgun; that the witness first accidentally discharged his gun upwards, but thereafter hastily firing two other shots, Slaughter was hit; that the deponent immediately started back to Woodburn to surrender himself to a peace officer; that as he approached the town he saw several women, and thinking they had heard of the difficulty he had encountered, and possibly might be alarmed to see him armed, he hid his gun under a fence. On cross-examination, he was asked where he was at the time of the shooting, and replied. "I don't know exactly where I was." He further said, however, that he did not think he was on the trail

indicated on the map, but that there were several other regularly traveled paths leading across Slaughter's land, on one of which he was traveling.

William Esch, a deputy sheriff, stated on oath that Remington, having given bail, was temporarily released and went with the witness to the outskirts of Woodburn, where they found under a fence a "30-30" Savage rifle, which the defendant admitted he had hidden at that place. This gun and the shells discovered by Pender were received in evidence. Slaughter testified that as he was plowing in his garden he heard the report of a gun behind him, and, looking back, a shot soon thereafter penetrated his left shoulder, whereupon he ran toward his house, when another shot was fired, and some missile pierced his left eye, destroying the sight thereof; that when he entered the house he seized a loaded double-barreled shotgun with which to defend himself, and started for Pomeroy's house; and that he did not see the person who did the shooting. Pender, whose testimony has hereinbefore been adverted to, further stated on oath that he heard shots fired November 22, 1906, in the afternoon, and saw Slaughter, as he reached the county road, carrying a shotgun and calling for help; that the witness took the gun and found it loaded with paper cartridges. the cap on one of which had apparently been struck or indented by the firing pin. James Monto, who is Slaughter's nephew, testified on rebuttal that he visited this uncle October 6, 1906, and attempted to use the latter's shotgun, but did not discharge it, and looking at the shells he found the cap had snapped.

3. The foregoing is thought to be a fair synopsis of the material testimony, relating to the cause of the shooting, and, based thereon, the question to be determined is whether or not the court erred in permitting the district attorney, over objection and exception, to illustrate his theory of the case by introducing in evidence a map of the *locus in quo,* having thereon red ink lines extending from the point representing the southwest corner of the pig shed to the point indicating the place where the plow was lying when the plat was made. In *People v. Phelan,* 123 Cal. 551 (56 Pac. 424), the defendant was con-

victed of the crime of murder in the first degree on circumstantial evidence, in part tending to support the theory of the prosecution that, lying in wait behind a stump, he watched the approach of his victim, whom he killed, and thereafter claimed that he acted in self-defense. In affirming the judgment in that case, Mr. Chief Justice BEATTY, referring to a plat of the *locus in quo* which was admitted in evidence, makes the following observation: "It is contended that the superior court erred in overruling objections of defendant to the admission in evidence of maps and photographs of the scene of the homicide, and especially of the evidence given in that connection as to the position of the hollow stump, as to the relative elevations of the stump and junction of the trail, as to the fact that there was an unobstructed view from the one point to the other, etc. The court did not err in admitting this evidence, the manifest purpose of which was to sustain the theory of lying in wait. The facts surrounding the killing were certainly material, and the topography of the spot where the killing occurred was clearly relevant. It was not for the court, but for the jury, to determine what theories could be justly founded on such facts."

In the case at bar the discovery of the shells, of the same caliber as that of the defendant's rifle, and the penetration by a bullet of a picket in a direct line between the points where the shells were found at the southwest corner of the pig shed and where the plow was left in the furrow in the garden, as claimed by Slaughter, when he was shot, are circumstances tending to establish the theory of the prosecution, in illustrating which the map, with the red lines thereon, was admissible in evidence, not to prove a substantive fact, but to illustrate the testimony applicable to the physical conditions. The map was made by a competent and evidently disinterested person after a careful survey of the premises, and, though the plat contained certain written words, descriptive of existing objects, no objection was urged by defendant's counsel against the admission of the map in evidence on account of such memoranda. In *People v. Johnson*, 140 N. Y. 350, 354 (35 N. E. 604, 606), the court,

in commenting upon the admission of such evidence, remark: "There was no error in permitting the drawings representing the premises to be put in evidence. They were not photographs, but sketches made by an artist showing the locality of the blood stains in the basement and on the doors above. He swore to their accuracy from his own personal knowledge and observation. The learned trial judge was extremely careful about them. He required explicit proof of their accuracy, and, when descriptive words were marked upon them, stood ready to strike off any to which reasonable objection should be made. They served only to explain localities, and their accuracy was satisfactorily shown."

4. Dr. Neil O'Leary, a practicing physician, testified that he visited Slaughter professionally soon after he was shot, and found a large penetrating wound in the left shoulder; that between the patient's third and fourth vertebra he observed a protuberance, in which he made an incision and removed a ball that had become "mushroomed," which bullet was identified by him and received in evidence. The witness further stated on oath that, immediately after treating the wound, he visited Slaughter's premises and found, in the vicinity where the shooting occurred, a picket that had been pierced by a bullet; that the entrance of the bullet had made a small hole, but its exit had produced a larger perforation; that he removed the paling, which, having been produced at the trial, he identified, whereupon he was asked,

"Did you ever handle firearms?" and he answered:
"Yes, sir.
Q. Have you ever owned a 30-30 rifle?
A. No, sir; I have never owned one. I have handled one.
Q. Do you know how large a cartridge it has?
A. Yes, sir.
Q. Do you know how large the slug is?
A. Yes, sir.
Q. Do you know how large a hole the slug would make?
A. I do.
Q. State whether or not, in your opinion, a 30-30 rifle would make a hole the size of this one in this picket."

The defendant's counsel objected to the question, on the ground that, as the bullet had been received in evidence, the orifice in the paling afforded the better proof of the fact sought to be elicited. The objection was overruled, and an exception allowed, whereupon the witness replied, "That is about the size hole it would make." It is argued by defendant's counsel that, although their client, as a witness in his own behalf, testified that he did the shooting with a 30-30 rifle, as the bullet and the picket referred to by the witness had been received in evidence, the jurors were as competent as O'Leary to determine whether or not the hole in the paling had been made by a bullet of the caliber specified, and, this being so, an error was committed in permitting the witness to answer the question. It will be remembered that the objection interposed at the trial is based on the requirement which the law imposes upon a party to furnish primary or best evidence, while the contention of defendant's counsel in this court seems to rest on the assumption that the question propounded involved an inquiry concerning a matter which was within the observation of persons in the ordinary walks of life, and therefore it did not require an answer from an expert witness. It could probably be said that the legal principle now insisted upon was not considered by the trial court, and for that reason its action in determining the matter was not subject to review. Treating the question, however, as properly reserved, we think average persons, who, it must be assumed, composed the panel of the jury, could not say with any degree of certainty what a "30-30" rifle was, or determine what would be the size of a hole which a bullet discharged from a gun of that caliber would make in a paling. Believing that correct answers to these inquiries could not be given by all men of common education and experience, and that the jury were incapable of forming a correct conclusion on the subject from a comparison of the enlarged "mushroomed" bullet with the hole in the picket, the testimony so objected to was admissible: *First Nat. Bank* v. *Fire Association,* 33 Or. 172 (53 Pac. 8) ; *Farmers' Bank* v. *Woodell,* .

38 Or. 294 (61 Pac. 837); *Aldrich* v. *Columbia Railway Co.*
39 Or. 263 (64 Pac. 455); *Ruckman* v. *Imbler Lumber Co.*
42 Or. 231 (70 Pac. 811).

5. Dr. J. P. Goray testified that he was a practicing physician, and made a specialty of diseases of the eye, ear, nose and throat, and that on December 9, 1906, he had treated Slaughter; and he was thereupon asked: "Did you examine his wounds at that time?" An objection to the inquiry on the ground that it was incompetent, immaterial and irrelevant, having been overruled, he replied: "I examined his eye, and saw his back dressed." After detailing the then condition of the patient, the witness further testified that on January 4, 1907, he removed Slaughter's injured eye to preserve the sight of his remaining organ of vision. It is contended by defendant's counsel that the testimony so objected to did not relate to any of the issues involved in the trial, but tended to arouse sympathy for Slaughter in the minds of the jurors, and to divert their attention from the merits of the case, to the prejudice of their client; and hence an error was committed as alleged. In the commission of the crime charged in the information herein, the intent with which the shooting was done is necessarily a controlling element. It is not the intention to use a deadly weapon, but the determination to kill, of which the use of the weapon is evidence, that constitutes an assault with intent to kill: *Palmore* v. *State,* 29 Ark. 248. Testimony, therefore, tending to show the magnitude of an assault, from which a felonious intent is deducible, may be admitted for that purpose: *People* v. *Sutherland,* 104 Mich. 468 (62 N. W. 566). It is competent, as a part of the *res gestae,* for a person who has been beaten by another to detail the extent and effect of the injury inflicted: *People* v. *Zounek,* 66 Hun, 626 (20 N. Y. Supp. 755). So, too, a physician who has treated a person wounded by the felonious use of a dangerous weapon may testify as to the nature of such injury: *State* v. *Haynie,* 118 N. C. 1265 (24 S. E. 536). We believe the testimony of Dr. Goray was admissible, in the consideration of which the jury

might determine whether or not the defendant, in using the weapon, intended to take Slaughter's life.

6. The court charged the jury in part as follows:

"I further instruct you, in relation to the law of self-defense, that one cannot claim its benefits if he has intentionally put himself where he knows or believes he will have to invoke its aid.    The circumstances justifying an assault under the law of self-defense must be such as to render it unavoidable.    If you believe from the evidence beyond a reasonable doubt that the defendant could have avoided any conflict between himself and Slaughter, without increasing the danger to himself, it was his duty to avoid such conflict, and so render a resort to the law of self-defense unnecessary.    If the defendant sought the conflict with Slaughter, and Slaughter showed fight, and used the deadly weapon or did an act in such a way as if he was about to engage in an affray, if under those circumstances the defendant sought the conflict, he could not invoke the law of self-defense until he had himself first retreated so far as he could with safety to himself."

An exception having been taken by defendant's counsel to this part of the charge, it is insisted that an error was committed in giving it.    The instruction thus challenged is similar in import to a part of a charge given in the case of *State* v. *McCann*, 43 Or. 155, 161 (72 Pac. 137, 139), in speaking of which it is there said: "The language employed by the court in the instruction complained of must be read in the light of the surrounding facts.    It is possible that, under some circumstances, the charge might be subject to objection; for in a free country it is not expected that one person shall flee from another, and it may be that the demands of business might require one intentionally to go where he knows or has reason to believe he may be in imminent danger, and possibly compelled to resort to force as a matter of self-defense."

In order thoroughly to understand the meaning of the instruction hereinbefore quoted, other parts of the charge relating to the same subject, which immediately precede the language complained of, will be set out, to wit:

"Although Slaughter may have been a violent man, or a dangerous man, and although he may have made threats against

the life of the defendant, yet he does not forfeit his right to personal safety unless he does some overt act indicating a present purpose to do injury or great bodily harm, or to kill the defendant. Mere threats alone, without some overt act indicating an intent to carry the threats into execution, would not authorize the killing or doing great bodily harm by the defendant, and would not justify the defendant in shooting Slaughter as a means of self-defense. The right of self-defense being founded upon necessity, the party who would invoke it must avoid the attack, if he can do so without danger or peril to himself. Hence it is that no threat to kill or inflict great bodily injury, without an overt act indicating a design to carry the purpose into immediate effect, will justify the taking of human life; and it is the duty of one that is threatened so to act that he will not precipitate the attack, and thus himself bring on the necessity for taking life which he could safely avoid.

On the other hand, if the defendant was where he had a right to be, and was assaulted by Slaughter with a deadly weapon, and without provocation, and with the apparent purpose of killing the defendant or doing him great bodily harm, or if the acts of Slaughter were such as to lead a reasonably prudent man in the defendant's situation to believe, and the defendant did honestly believe, that he was in imminent danger of death or great bodily harm, the defendant would not be obliged to retreat, but could stand his ground and meet the attack in such a way and with such force as, under all the circumstances, he at the moment honestly believed, and had a reasonable ground to believe, was necessary to save his own life, or protect himself from great bodily harm.

Again, the defendant would have no right to seek a quarrel with Slaughter, although Slaughter had made threats and was a dangerous man."

Immediately following the instruction first above repeated, the court further said to the jury:

"It is for you to determine now whether, on the one hand, the defendant was where he had a right to be, and was attacked by Slaughter or assaulted by him, or whether the acts of Slaughter were such as to raise in the defendant's mind, as a reasonably prudent man in his situation, a reasonable belief that there was in store for him either death or great bodily harm, and that that danger was imminent; but you are to consider, on the other hand, whether he sought a conflict with Slaughter, and apply to it the rules which I have given you."

Considering this part of the charge in connection with the instruction excepted to, the defendant, prior to the shooting, knew that Slaughter had threatened to take his life, and by reason of such manifest hatred Remington must have known that the privilege of passing over the trail that crossed his enemy's land would be denied him, though persons living in that vicinity had used the way without·objection.   Necessarily possessing this information, the defendant voluntarily selected a route which, when traveled, took him, armed with a dangerous weapon, upon the premises of his adversary, who, he must have had reason to believe, would dispute his further progress in that direction.   Slaughter had been living at Woodburn, and it is claimed that his return to the farm was not known by Remington, when the latter undertook to pass over the trail. His want of knowledge in this particular was a question which the jury were called upon to determine, and they undoubtedly considered the matter.   In view of all the attendant facts and circumstances, we believe the court was warranted in giving the instruction complained of.

Other alleged errors are assigned; but, deeming them unimportant, the judgment is affirmed.          ·          AFFIRMED.