THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH WOLTERING, Appellant.

52

Argued May 24, 1937; decided July 13, 1937.

*Louis Waldman* and *David I. Ashe* for appellant. There is no proof that the piece of cloth came from a coat belonging to defendant. (*People* v. *Zammuto*, 280 Ill. 225; *People* v. *Newton*, 3 N. Y. Cr. Rep. 406; *People* v. *Muhley*, 11 Cal. App. 129.) The only way the jury could have rendered a verdict of guilty on the evidence adduced was by pyramiding inference upon inference contrary to the established rules as to circumstantial

evidence. (*People* v. *Bennett,* 49 N. Y. 137; *People* v. *Harris,* 136 N. Y. 423; *People* v. *Razezicz,* 206 N. Y. 249; *Lamb* v. *Union Ry. Co.,* 195 N. Y. 260; *People* v. *Fitzgerald,* 156 N. Y. 253; *People* v. *Galbo,* 156 App. Div. 414; 218 N. Y. 283; *People* v. *Acerno,* 184 App. Div. 541; *People* v. *Muhley,* 11 Cal. App. 129.) The alleged efforts by the defendant to conceal certain facts, from which the prosecution has sought to infer a " consciousness of guilt," are entirely consistent with the defendant's innocence, and may not, as a matter of law, be used as the basis for the further inference that the defendant was guilty of the crime charged against him. (*People* v. *Muhley,* 11 Cal. App. 129; *People* v. *Montlake,* 184 App. Div. 578; *Matter of Case,* 214 N. Y. 199; *People* v. *Galbo,* 218 N. Y. 283; *Jewell* v. *Parr,* 13 C. B. 916; *People* v. *Curtis,* 217 N. Y. 304; *Hendrickson* v. *People,* 10 N. Y. 13.) In the absence of sufficient proof that the piece of cloth came from defendant's coat, and in the absence of sufficient proof that defendant wore the coat, there was not, on the whole case, sufficient evidence to submit to the jury. (*People* v. *Erit,* 237 App. Div. 35; *People* v. *Ledwon,* 153 N. Y. 10; *People* v. *Suffern,* 267 N. Y. 115; *People* v. *Smith,* 84 Misc. Rep. 348.) The trial court committed reversible error in admitting testimony by the defendant's common-law wife as to statements made by the defendant to her. These statements were privileged communications and were inadmissible in evidence. (Wigmore on Evidence [2d ed.], § 2332 ff.; Greenleaf on Evidence [16th ed.], § 254; Richardson on Evidence [4th ed.], § 508; *Stillman* v. *Stillman,* 115 Misc. Rep. 106.)

*Samuel J. Foley,* District Attorney (*Sol Boneparth, Herman J. Fliederblum, Martin M. Frank* and *George Tilzer* of counsel), for respondent. Although the case against the defendant rests solely on circumstantial evidence, the evidence adduced is more than sufficient to sustain the conviction. The verdict of the jury was

not reached as the result of pyramiding inference upon inference. The evidence established, beyond a reasonable doubt, that the piece of cloth, came from the defendant's coat. (*People* v. *Lytton*, 257 N. Y. 310; *People* v. *Becker*, 215 N. Y. 126; *People* v. *Cignarale*, 110 N. Y. 23; *People* v. *Trombino*, 238 App. Div. 61; *People* v. *Harris*, 136 N. Y. 423; *People* v. *Lustig*, 206 N. Y. 162; *People* v. *Wolter*, 203 N. Y. 484; *People* v. *Smith*, 172 N. Y. 210; *People* v. *Gonzalez*, 35 N. Y. 49; *People* v. *Enright*, 221 App. Div. 26; 248 N. Y. 633; *People* v. *Deitsch*, 237 N. Y. 300; *People* v. *Gorski*, 236 N.Y. 673; *People* v. *Burt*, 51 App. Div. 106.) No error was committed by the trial court in admitting in evidence defendant's conversation with the woman with whom he resided, for she was not the common-law wife of the defendant. (*Pardee* v. *Mutual Benefit L. I. Co.*, 148 Misc. Rep. 860; *People* v. *Truck*, 170 N. Y. 203.)

HUBBS, J. Defendant was indicted on a charge of murder in the first degree, based upon the shooting and killing of one David North on the 1st day of February, 1935. The jury found the defendant guilty of manslaughter in the first degree. The conviction rests upon circumstantial evidence.

The deceased was thirty-two years of age and resided at the southeast corner of One Hundred and Eighty-first street and Grand avenue in the Bronx. South of the apartment house in which deceased lived and immediately adjoining it, is a church yard with a driveway running through the yard east and west. The rear of the church yard faces Davidson avenue and the easterly side of the church yard is made up of a retaining wall with a fence on top of it which wall and fence are thirteen feet above the level of Davidson avenue.

On the evening of February 1, 1935, when the deceased arrived at the apartment house, he was carrying on his person $248.48 in money and various articles of jewelry. He was shot in the lobby of the apartment house which

is two steps above the street level. In the vestibule there is a platform four feet long and six feet wide and then thirteen steps lead to another or higher platform. On the south at the head of the thirteen steps is a row of buttons or buzzers. Separating the lobby from the main hall in the building are two French doors which were closed and locked on the night in question. Entrance is gained either by a key or by having a tenant in an apartment press a button which releases the latch or lock, permitting a visitor to enter without a key. On the first or ground floor, as one enters the main hall, is an apartment occupied by the superintendent of the building and his wife. The evening of February 1st was cold, the temperature ranging from twenty-one to twenty-two degrees, and there was about six inches of snow on the ground. At about six-thirty P. M. the superintendent of the building entered the house and went to his apartment on the main floor. At the time, he did not notice anything lying on the floor of the lobby. Very shortly after the deceased entered the lobby, he rang the buzzer or bell in his apartment and his wife answered it. This occurred at about six-thirty P. M. At about six-thirty-five P. M. the superintendent heard a commotion outside which sounded as if several persons were running down steps. He immediately left his apartment, went to the door separating the main hall from the lobby, opened the door and stood on the upper landing in the lobby. He observed two men on the lower landing or platform, fighting or wrestling. One of the men was bending over with his knee almost touching the ground and the other man was standing or bending over him. The superintendent ordered them out, telling them if they wanted to fight to go outside. At that moment he heard a shot, saw smoke in the vestibule and heard the falling of glass. The superintendent ran down the steps to the lower level of the vestibule and at the same time one of the men ran out of the vestibule. North, the deceased, whom the superin-

tendent did not at the time recognize, stood for a moment at the doorway leading to the street with his hand on the right side of his neck. Then he went out, walked about fifty feet south in the direction of the church yard and came back immediately. The superintendent had followed him out of the house and stood in front of the house observing him. When the superintendent got outside, the man who first ran out was not in sight. When North, the deceased, came back to the house, he said to the superintendent, " Call the ambulance, I am shot." It was not until then that the superintendent recognized North as a tenant in the house.

The superintendent, with the help of his wife, who had come out shortly after her husband and was in the vestibule when North, the deceased, came back, assisted North to the superintendent's apartment. As they were escorting North upstairs to the superintendent's apartment, the superintendent picked up in the lobby a piece of cloth about ten and one-half inches by twenty and one-half inches, torn from a winter overcoat. He had noticed that the man who ran out and was followed by North wore a dark overcoat. No one other than the superintendent of the building saw the man who shot deceased and he could not identify defendant as the man. The defendant is connected with the crime only through the medium of the piece of overcoat material found in the lobby. That material was described by an expert in the clothing business as the lower part torn from an overcoat, the left vent, and of a material known as blue montagnac and by another witness as chinchilla. The first expert pointed out the similarity between montagnac and chinchilla, the difference being that montagnac is a little wirier. The proprietor of a tailor shop testified that in June, 1934, defendant had left his winter overcoat there for repairs and had taken it from her shop in October, 1934. She described defendant's overcoat as navy blue in color, as being half-lined and identified the piece of cloth as resembling the cloth in the winter overcoat.

It further appeared that the coat from which the piece was taken was a half-lined coat.

The defendant lived with Agnes McGuirl, claimed to be his common-law wife. She testified that when defendant left his home that morning, he was wearing a winter overcoat, the material of which was like that in the piece found in the vestibule of the apartment house. She further testified that he returned to his home that night about seven-thirty o'clock; that at the time he did not have the blue winter overcoat with him but instead was wearing a gray checkered spring overcoat. She had been at home all day and he had not returned to change his coat nor was the gray overcoat in the house when he left that morning, although it was an overcoat he had previously purchased. When he arrived at his own home he called his so-called common-law wife into a bedroom out of the hearing of her son who was twelve years of age and said to her that if anybody inquired she was to say that he arrived at home between five and six o'clock that evening and that he did not have a blue overcoat.

An aunt of defendant lived about seven minutes' walk from the apartment house where deceased was shot, at a distance of about six city blocks south and east of the apartment house. The aunt testified that sometime between six and eight o'clock that night, the defendant came to her home carrying his overcoat on his arm, and that it was folded so that the inside of the coat showed and that it was a dark overcoat. He said he had been in a fight, that there was blood on his overcoat and that he would call for it the next morning. He left it and went away. The next morning, he called at his aunt's home at the time wearing a light gray coat and took away the coat which he had left there.

The gun with which deceased was killed was found in the church yard about forty or fifty feet south of the apartment house and about forty feet east of Grand avenue, which would indicate that the man who did the

shooting went south in Grand avenue and through the church yard. That would be a course which a man might take in going from the scene of the crime to the home of defendant's aunt and it was in the direction that the deceased started when he left the apartment house immediately after the shooting.

On this appeal, the defendant contends, *first*, that there is no proof that the piece of cloth came from a coat belonging to the defendant or that the defendant was the person who wore the coat even if it be assumed that it came from the coat of the man struggling with North. Of course, there is no positive evidence upon those points but positive evidence was produced to the effect that on the morning of the day of the crime, the defendant left his home wearing a blue coat of a material similar to that in the piece found in the hall, that it was a cold winter day, that at about the time of the crime he appeared at the home of his aunt not wearing his coat but with it folded inside out and on his arm, that he left it there and appeared at his home wearing a light spring overcoat and that the next morning he called at his aunt's home for the coat he had left there the night before, that he told his wife (so called) to say that he came home between five and six o'clock and if asked to say that he did not have a blue overcoat, that the material in the piece was identified by his own tailor as similar to that in his coat. It is urged by the People that from that evidence the jury was justified in reaching the conclusion that defendant was present at the scene of the crime and that he was the owner of the coat from which the piece was torn and was wearing it on that occasion and that he fired the fatal shot.

While certain facts point to the guilt of defendant and the hypothesis of delinquency or guilt flows naturally from the facts proved, it cannot be said that they are wholly inconsistent with his innocence. He was not seen at the scene of the crime and there is no proof which shows conclusively that he was there. It does not appear

how the finger of suspicion came to be pointed at him. On the one hand, we have the finding of a piece of cloth at the scene of the crime like material of which his coat was made. No one testified positively that it was of the same material. We have the finding of the gun with no proof that the defendant ever possessed it. We have proof that the defendant left his home in the morning, wearing a winter overcoat, that he left it at his aunt's home over night and took it away again the next morning; that he told Agnes McGuirl, with whom he lived, not to admit that he had such an overcoat and that he refused to tell her what became of it. Other than the fact that he had it folded and over his arm, there is no proof that any part of it was missing when he left it at his aunt's home and there is no proof of the exact hour when he left it at her home which would preclude the possibility that it was left there before the crime was committed. The facts are not inconsistent with his innocence. The material found on the floor of the apartment lobby could have been material from another coat worn by another man. No case has been referred to where a conviction has been sustained in which there was not a closer connection established between commission of the crime and the accused. In each where a conviction has been sustained, there has been a motive with proof of opportunity and identification or direct connection by proof of possession by the defendant of articles belonging to deceased. None of those facts are present in the instant case.

If, to find defendant guilty, it was necessary for the jury to base its finding on inference alone, unsupported by proven facts, the conviction should not be sustained. On the other hand, if inferences that the crime was committed by defendant may be based on proven facts, the conviction may be sustained. The difficulty lies in determining whether the foundation for the inference of guilt does or does not rest upon direct testimony. We have proof that at the scene of the

crime was found a piece of overcoat material. Had it been shown that defendant was, at the time, at the scene of the crime, wearing an overcoat of a material apparently similar, failure to produce the coat he was wearing, since opportunity to dispose of it remained with him, would not preclude a conviction. The proof of his presence with the other evidence would permit the inference that the cloth came from his coat, that he was wearing the coat at the time, that it was he who fired the fatal shot, fled from the scene and disposed of the gun. But, to support such inference we must also infer his presence. Again, positive testimony that a piece of material had been torn from his coat, that a similar piece was found at the scene of the crime, that he had been wearing it that day, that he had an opportunity to dispose of the coat, that the one who fired the shot wore a similar coat, would have warranted the inference that he was present at the scene of the crime and was the person who fired the shot. If identification of the gun as one belonging to him had been made, that fact would no doubt have connected him with the crime to the extent that, with all the other facts proven, the jury might have inferred his guilt. As the evidence stands, however, there is neither identification of the defendant nor identification of anything found at or near the scene of the crime as his property.

As previously stated, the facts are not inconsistent with the innocence of the defendant. There is, it seems to us, a break in the chain of evidence however one attempts to reason from the proven facts, which may not be bridged by indulgence in inference. To sustain the conviction we would have to go further than has been gone in previous cases. Whatever may be the inference reasonably to be drawn from failure to testify when ability to deny or explain a course of conduct in a case where people have connected a defendant with a crime by identification, previous association with the

deceased, or other similar direct proof, an inference of guilt should not be permitted from failure to testify when no fact has been proven which links the defendant with the crime except by inference. Though in the instant case, by indulging in the same inferences the jury has been permitted to draw, the court may feel that the defendant is guilty, to allow the conviction to stand would violate principles which have stood the test of time and permit convictions where proof of guilt, in the accepted sense, is lacking. That a conviction may rest upon circumstantial evidence alone is not questioned. However, in such cases, the circumstances proved must conform to the test repeatedly stated in various language. In substance it is as stated in *People* v. *Bennett* (49 N. Y. 137, 144) and repeatedly reiterated by this court.

" In determining a question of fact from circumstantial evidence, there are two general rules to be observed.

" 1. The hypothesis of delinquency or guilt should flow naturally from the facts proved, and be consistent with them all.

" 2. The evidence must be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him, or, in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence."

We are also of the opinion that whether the People's witness Agnes McGuirl (Woltering) was the common-law wife of defendant should have been submitted to the jury as a question of fact, with instructions to disregard her testimony if it found that she was his common-law wife.

The judgments should be reversed and a new trial ordered.

CRANE, Ch. J., LEHMAN, O'BRIEN, LOUGHRAN, FINCH and RIPPEY, JJ., concur.

Judgments reversed, etc.