THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* JAMES A. LEARY, Respondent.

Third Department, November 20, 1952.

*Nathaniel L. Goldstein, Attorney-General (Paul W. Williams, Harris B. Steinberg, Wyllys S. Newcomb* and *Richard H. Kuh* of counsel), for appellant.

*James A. Leary,* in person, *Walter A. Fullerton, Francis J. Keehan* and *George B. Smith* for James A. Leary, respondent.

FOSTER, P. J. The defendant was asked through the media of several questions, whether he owned or had any beneficial interest in 688.8 shares of stock of the Saratoga National Bank. He answered in the negative. Upon the premise that his answers were false an Extraordinary Grand Jury for Saratoga County has indicted him for perjury.

The stock in question, so far as the records show, was issued and is listed in the name of Herbert C. Stone. The evidence presented to the Grand Jury that defendant owns the stock, or has a beneficial interest therein, was purely circumstantial. The indictment was dismissed at Special Term on three grounds: (1) — that it was not found on sufficient legal evidence; (2) — that illegal and prejudicial matters were brought to the attention of the Grand Jury; and (3) — that defendant was not permitted to explain his answers. From the order of dismissal the People have appealed to this court.

The chain of circumstances upon which the People rely began with the bank holiday in 1933. The opinion of the Special Term summarizes in considerable detail the evidence thereof that was presented to the Grand Jury and it is unnecessary for the purposes of this opinion to repeat this summary. Circumstantial evidence, of course, may suffice to sustain an indictment or conviction. But to sustain either an indictment or conviction evidence of this character must be such as to exclude, to a moral certainty, every hypothesis but that of guilt. (*People* v. *Woltering*, 275 N. Y. 51.) A grand jury may only indict when the evidence before them, unexplained and uncontradicted, would in their judgment warrant conviction by a petit jury.

To sustain the indictment against the defendant one essential element in the People's case was proof that the defendant owned, or had a beneficial interest in, the stock in question. Unless the circumstances shown exclude every reasonable hypothesis save that of ownership in the defendant the indictment cannot be sustained. The general rule is that a court may not weigh the evidence presented to a grand jury or attempt to pass upon the credibility of testimony offered. However, where the issue is tendered, the court may determine whether any reasonable mind could find the circumstances sufficient to satisfy the requirements of the circumstantial evidence rule for such an issue presents a question of law.

In my opinion it is unnecessary in this case to answer that question. It is clearly apparent, to my mind at least, that whether the circumstances presented satisfied the rule quoted

is a very close issue. Hence the introduction by the People of any illegal or prejudicial evidence assumes a vital significance. The record reveals at least two instances where evidence of such character was brought to the attention of the Grand Jury. An official of the bank, and a former officer were permitted to say, in substance, that they assumed or understood that the defendant owned the stock. Also testimony was elicited to show that defendant on other occasions and in connection with other property used various individuals as nominees, or, in other words, that on such occasions his real ownership was concealed by the use of dummies. Testimony of this character was inadmissible and highly prejudicial. It is quite impossible to believe that it did not influence the decision of the Grand Jury to find an indictment.

The public policy of the State is that a grand jury can receive none but legal evidence (Code Crim. Pro., § 256). Obviously this statute was enacted to safeguard a defendant's rights to a presumption of innocence and it cannot be ignored. It has been whittled away to some extent by cases which hold that where an indictment is supported by sufficient legal evidence, the receipt of some illegal evidence does not invalidate it. I find no well considered authority, however, which holds that the receipt of illegal evidence may be ignored where it is clear that such evidence must have influenced the deliberations of the grand jury.

The order of the Special Term should be affirmed.

BERGAN and HALPERN, JJ. (dissenting). The Code of Criminal Procedure (§ 313) is very specific in stating the reasons for which an indictment may be dismissed and in withdrawing expressly all other grounds from the range of judicial action. Usually courts would feel themselves required to obey this procedural direction of the Legislature according to its terms. None of the grounds upon which the Legislature authorized dismissal of an indictment exist in this case.

The reasons for which it has been asserted from time to time that courts will break through the prohibitions imposed upon them by section 313 are of such constitutional importance as to exist only when a court would be bound to say that the statute itself is invalid as applied to a case under consideration; and it must be admitted that constitutional questions of this magnitude are rare and that the power of the court to disregard the statute has been sparingly exercised under the New York criminal practice.

The dismissal of an indictment because of mere errors in the receipt of evidence, improper or conclusory in form, on the theory that this sort of defect is such an invasion of constitutional rights as to make the statute invalid has never been given the approval of the Court of Appeals. The whole trend of New York law is in just the opposite direction.

The leading case in which the asserted right of a court to disregard the limitations of section 313 and dismiss an indictment is treated is *People* v. *Glen* (173 N. Y. 395 [1903]). Judge WERNER felt that the legislative power to regulate the criminal practice was "too well established" to require discussion (p. 399), but the court, he held, retained the power notwithstanding the statute, to dismiss an indictment found "without evidence" or found "upon illegal or incompetent testimony" (p. 400).

The actual decision in that case, however, went the other way, and although the language of Judge WERNER has often been quoted, and the case cited as a precedent for the dismissal of indictments notwithstanding the statute, what the court actually did in sustaining the indictment in the case before it must be kept in mind carefully in evaluating the decision.

The admission before a grand jury of some "illegal" or some "incompetent" testimony certainly cannot be authority to disregard the statute, even if Judge WERNER's opinion be taken literally, since he used very guarded words of expression which would suggest that only indictments wholly based on illegal or incompetent evidence would justify a dismissal by a court in disregard of the limitations of section 313.

This is a view of the matter which the New York courts have since taken quite consistently. Judge WERNER himself made this clear a few years after the *Glen* case in *People* v. *Sexton* (187 N. Y. 495 [1907]) where it was argued on the strength of his *Glen* opinion that the receipt of evidence before the Grand Jury of the testimony of small children without preliminary judicial examination of them invalidated the indictment. It was held that this procedure did not invalidate the indictment, and Judge WERNER quoted with approval from Underhill's *Criminal Evidence* the observation that the receipt of some incompetent evidence in connection with competent evidence, or the examination of an incompetent witness, "is not ground for quashing an indictment" (p. 513).

In *People* v. *Rabinowitz* (301 N. Y. 763 [1950]) one count of the indictment had been dismissed by the County Court. The

indictment charged conspiracy between licensed agents of professional bondsmen and an unlicensed bail bond solicitor to violate section 331 of the Insurance Law. The Grand Jury had before it some hearsay evidence and some strongly prejudicial evidence by a judge called as a witness; but the Appellate Division, Second Department (277 App. Div. 793, 794) was of opinion that " the receipt of the illegal evidence " before the Grand Jury did not invalidate the indictment in view of the fact there was sufficient other competent evidence. Affirmance by the Court of Appeals was without opinion. To the same effect see *People* v. *Grout* (174 App. Div. 608 [1916]), which relies on the *Sexton* case, and *People* v. *Smith* (258 App. Div. 800 [1939]).

In the light of this development of the New York rule, the matters complained of here, that a witness " presumed " that Herbert C. Stone " was a representative " of Mr. Leary and that he " believed " he was such a representative; that another witness " assumed " Stone was " connected with " the law office of Leary and Fullerton; proof of Mr. Leary's practice to have property in the names of nominees, and other evidence of this sort cannot form a valid basis for dismissal of the indictment if there is other sufficient evidence to support it.

The case in support of the indictment for perjury is made out on circumstantial evidence presented by the People to show that Mr. Leary was the beneficial owner of the stock in Stone's name.

The block of 688.8 shares of stock of the Saratoga National Bank which stood in the name of Stone constituted one third of the total stock of the bank; it was the largest block held by any single stockholder.

It was overwhelmingly established that Stone was not the beneficial owner of the stock but that he was merely a nominee. Stone was a man in very modest circumstances who lived on odd jobs and who had worked from time to time in gambling houses. During the period the stock stood in his name he was in debt and he had no other assets of substance; he knew very little about the bank stock; he had never bought or sold any other stock. He testified he did not know any of the bank's officers or employees. He had never been consulted about any of the bank's affairs, and he had never volunteered any views in respect thereto.

Stone claimed that he had bought 334.4 shares of the bank stock from one Mac Finn in December, 1933, for $2 a share.

The proof showed that only eight months before that, $100 a share had been paid to the bank to salvage this stock. This payment had been made by the defendant under circumstances to be discussed later. In the light of all the evidence the jury was clearly justified in rejecting Stone's story that he had bought the shares of stock for himself at a nominal price.

The documentary evidence showed that in December, 1933, certificates for 334.4 shares which had stood in the name of Mac Finn or had been assigned to him were surrendered to the bank and that new certificates were issued in the name of Stone. These certificates were delivered to Mr. Leary's personal secretary, although, according to her testimony, she did not know Stone and had not been authorized to act for him. In January, 1951, the bank declared a stock dividend of 100%. The certificate representing a dividend of 344.4 shares on the stock standing in Stone's name was delivered at the defendant's law office to his law partner's personal secretary.

Stone answered in the affirmative both when he was asked whether he had left it entirely up to Mr. Leary to handle the stock and when he was asked whether it was a fair statement that Mr. Leary had handled the stock interest in the bank as he had seen fit.

When Stone was pressed for information about the stock early in the Attorney-General's inquiry, he went to the defendant's law office to find out exactly what his holdings in the bank were. Prior to his being told by the investigators, he had no idea that the stock was worth " a great deal of money ".

The Saratoga National Bank had been closed at the time of the bank holiday in March, 1933, and the Federal authorities had refused to allow it to reopen unless the depositors converted 15% of their deposits into preferred stock, thus producing the sum of $500,000 in preferred stock, and the common stockholders contributed $100 per share, or $100,000 in all, to the surplus account of the bank.

The required sums were raised; most of the common stockholders contributed the sums asked of them, but some were unable or unwilling to do so, and their stock was taken over by others who voluntarily paid the stipulated sum of $100 for each share of stock acquired. Mr. Leary paid the sum of $36,000 on account of the stock which then stood in Finn's name.

The bank prospered; by January, 1951, it had retired all the preferred stock and, as has been noted, it was able to declare a 100% stock dividend on the common stock.

The record indicated that there was a close financial relationship between Mr. Leary and Finn; to say the least, Mr. Leary had a strong interest in Finn's affairs.

In December, 1941, shortly before his death, Finn transferred substantially all of his remaining property to Mr. Leary, and in return Mr. Leary cancelled Finn's promissory notes, which he then held in the amount of over $300,000. The proof authorized the drawing of either the inference that Finn had been a nominee for Mr. Leary all along, or the inference that there had been some arrangement between them under which Mr. Leary put up the money for Finn's investments and Finn gave promissory notes for equivalent amounts so that Mr. Leary could acquire ownership of the property which stood in Finn's name by enforcing the collection of the notes. Either inference provides a sufficient background for the facts underlying this indictment.

As has been noted above, when the stockholders were called upon in 1933 to make the contribution of $100 per share, Mr. Leary paid $36,000 to the bank on account of the Finn shares. Mr. Fullerton, who is Mr. Leary's law partner, testified that he understood that this represented a loan by Mr. Leary to Finn. The jury had the right to draw the inference in the light of all the evidence that this was not a real loan but that Mr. Leary had paid the money to the bank on his own account, and that he had been the beneficial owner of the stock for some time, or had taken over the beneficial ownership of the stock upon Finn's finding himself unable to pay the required contribution. Upon this view of the case, the subsequent transfer of the stock from Finn's name to that of Stone merely constituted a substitution by Mr. Leary of one nominee for another.

Moreover, even if it is assumed that the payment originally represented a loan by Mr. Leary to Finn, the validity of the jury's ultimate conclusion is not affected. Upon this view, Finn, in December of 1933 held 344.4 shares of stock for the salvaging of which Mr. Leary had just lent him $36,000. With this indebtedness to Mr. Leary still unpaid, Finn then transferred the stock on account of which the indebtedness had been incurred, to the financially irresponsible Stone, who was not in a position to assume the indebtedness and who did not assume it, and who plainly received the stock as a mere nominee. In these circumstances the jury had the right to find that the transfer was made at Mr. Leary's direction and that Stone was his nominee. It was thus open for the jury to find that, whether

the pre-existing relationship between the defendant and Finn in respect of the stock had been that of beneficial owner and nominee or that of creditor and debtor, the stock relationship established between the defendant and Stone thereupon became that of beneficial owner and nominee.

In the face of all of this, it certainly cannot be held as a matter of law that reasonable men could not accept the circumstantial evidence in this case as a reliable and trustworthy foundation to find Mr. Leary was the beneficial owner of the stock standing in Stone's name.

To demonstrate that the chain of circumstantial proof in support of the indictment is insufficient the language of *People v. Woltering* (275 N. Y. 51) is heavily relied on by defendant. The rule in a circumstantial evidence case is that the " hypothesis " of guilt " should flow naturally " from the facts and " be consistent with them all " and the evidence must be such as to exclude " to a moral certainty " every hypothesis but that of his guilt. The facts must all be inconsistent with his innocence (p. 61).

It would take a most extraordinary case, however, to regard such matters as exclusion of innocence to a " moral certainty " and the consistency or inconsistency of facts with guilt as questions of law; such matters, under the legal rules stated by the court, are ordinarily for the jury.

In the *Woltering* case itself the indictment was not dismissed but a new trial ordered and the matter sent back by the court for consideration by another jury, even though the record on defendant's connection with the murder was extremely thin. The court certainly would not there have dismissed an indictment based on that circumstantial evidence, as its action in ordering a new trial clearly indicates.

The rule on exclusion of the hypothesis of innocence to a moral certainty, stated in the *Woltering* case stems from the opinion of Chief Judge CHURCH in *People v. Bennett* (49 N. Y. 137) and is quoted literally from that opinion.

That was a case of murder in which the proof against the defendant depended almost entirely on the circumstance of his presence and opportunity to kill his wife. The conviction was, nonetheless, affirmed. The Chief Judge observed that some of the members of the court were of opinion that the evidence of some of the facts was " too unsatisfactory " and the facts themselves " too inconclusive to exclude any hypothesis " consistent with innocence and that others thought the jury was justified

from the evidence in finding that the prisoner inflicted the wound. This he felt " shows " that the question " is one of fact ". (P. 147.)

This, it must be borne in mind, was not a review of a Grand Jury's decision to indict, but of the verdict returned after a trial, a matter in which the court has far greater supervisory power and control than over the Grand Jury's intramural process of evaluating the facts on which an indictment is based.

The order should be reversed.

BREWSTER and COON, JJ., concur with FOSTER, P. J.; BERGAN and HALPERN, JJ., dissent, in a memorandum.

Order affirmed.