Fuld, J.
Defendant, charged with killing his mother and father, stands convicted, on both counts, of murder in the first degree. This is the third time that the case has been before us.
Defendant’s father, 75 years old, and his mother, aged 80, were killed on Tuesday, January 10, 1950, in their apartment on Quincy Street in Brooklyn, New York. At first, a burglar or other intruder was suspected, but the presence on the Leyras ’ breakfast table of a third cup prompted the belief that the killer had been known and was, in fact, a welcome guest. That circumstance, plus a possibly false alibi and an inadequate explanation of what had happened to the clothing, previously worn, which he might have been wearing on the day of the killings, directed suspicion to defendant. He was interrogated, at first intermittently, and then more constantly from about 9:00 a.m. Thursday, through most of that day and night, until 6:30 Friday morning. Although on Friday at 6:30 a.m., he made what appear to be damaging statements to Police Captain Meenahan, his principal interrogator, about being present in his parents’ apartment (302 N. Y. 353, 358), he persisted in his denials of complicity or guilt. At any rate, following his parents’ funeral on Friday, he returned to the police station where the questioning had taken place. And there, in a room wired for sound and equipped with recording devices, he met Dr. Max Helfand. The psychiatrist continued the efforts of the police to have defendant admit his guilt. Finally, after more than an hour and a half of questioning, Dr. Helfand induced defendant to say that he had *202 killed his parents (see, e.g., 302 N. Y., at pp. 359-361; 347 U. S., at pp. 559-560). The confessions thus wrung from defendant’s lips were immediately repeated to Captain Meenahan, then to his business associate William Herrschaft, and, sometime later, to two assistant district attorneys.
We reversed defendant’s first conviction on the ground that the confession made to Dr. Helfand was inadmissible since it had been the product of mental and psychological coercion (302 N. Y. 353). Upon the ensuing retrial, the confession to the psychiatrist was not relied upon by the People, but the several other confessions, made shortly thereafter, were used. The jury returned a verdict of guilt and, on the appeal from that conviction, this court, by a 4 to 2 vote, affirmed (304 N. Y. 468). However, the Supreme Court, in a habeas corpus proceeding instituted after its denial of certiorari (345 U. S. 918), reversed, holding that those subsequent confessions, being [1] ‘ simply parts of one continuous process ’ ’, were tainted by the same poison that invalidated the statement to the psychiatrist (347 U. S. 556, 561).
It had all along been recognized, by the trial judge (on both trials) and the district attorney (on the first appeal), that, without those confessions in the record, there was not sufficient evidence to justify a finding of guilt.[1] Accordingly, when the case went back to the county court following the Supreme Court’s decision, defendant moved to dismiss the indictment, on the ground that the evidence before the grand jury was insufficient. The judge before whom that motion was made granted it on January 31, 1955, holding that “ without the confessions which have been ruled out ” by our court and the United States Supreme Court, the evidence — which, we note, did not include the statements made to Meenahan early Friday morning — “ is insufficient before the Grand Jury, so that the indictment must be dismissed.” In the meantime, however, on January 20, the district attorney resubmitted the case to another grand jury — as he was privileged to do without a court order (see People v. Rosenthal, 197 N. Y. 394, 400-401) — and that body returned a *203 superseding indictment. Defendant then moved to dismiss the latter indictment. This motion, heard by the same judge who had earlier dismissed the first indictment, was denied, and the case proceeded to trial and to conviction on the second indictment.
In weighing the evidence, in deciding whether it establishes defendant’s guilt beyond a reasonable doubt, it is well-nigh impossible to exclude from mind the confessions made by defendant after his session with Dr. Helfand. Yet exclude them we must, if the fundamental policy against police coercion or other illegality is to be anything more than an empty gesture. The case must be decided solely on the basis of the record now before us.
Although defendant did not take the stand, there was considerable testimony by police officers as to the results of his interrogation soon after the homicides. Defendant told the police that on the fateful Tuesday, after sleeping the preceding night in the Manhattan apartment of his paramour, he had arisen at 10:00 a.m. He accepted a new telephone book from a man who came around distributing them, then went out for breakfast, purchased a box of candy and took it to his wife, whose birthday it was, at their home in North Bergen, New Jersey. He arrived in North Bergen at about 11:30 a.m., stayed there a short while and then returned to his father’s shop in New York at 1:30 p.m. Upon his arrival, his business associate Herrschaft told him that his father had not come in to work that day. When a number of telephone calls produced no word of his parents, defendant and Herrschaft went to their apartment in Brooklyn and discovered the bodies.
Defendant’s wife, testifying for the defense, corroborated the facts that January 10 was her birthday and that defendant came to visit her at 11:00 or 11:30 that day and presented her with a box of candy. And his mistress, testifying for the prosecution, recalled that, when she left for work between 6:45 and 7:00 a.m., defendant remained in bed and ‘ ‘ just went back to sleep ’ ’. As for his assertion, though, that he accepted a telephone book from the delivery man, defendant’s account was somewhat shaken. One witness testified for the prosecution that he was engaged in delivering telephone books on the morning in question, that he knocked on the woman’s door at about 9:20 a.m. and, *204 getting no response, left the book at the door, where it still remained when he left the building 8 or 10 minutes later. And another People’s witness, though her credibility was severely impaired on cross-examination, stated that she saw defendant enter his parents’ apartment house in Brooklyn at about 7 o’clock in the morning as she was leaving for work.
Additional circumstances relied upon by the prosecution concern the disappearance of defendant’s overcoat and his acquisition of a raincoat, a new suit and new shoes. Prior to January 10, the date of the homicides, defendant had usually worn a blue overcoat on cold winter days. On that day, however, his wife, his mistress and Herrschaft all noticed that he had on a raincoat that they had never seen before. He gave discrepant stories about what had happened to his old coat and offered explanations less than satisfactory concerning the purchase of the new clothing.
Beginning Tuesday night, January 10, defendant had been questioned intermittently by Captain Meenahan and other policemen. At 10 o’clock of Thursday evening, Meenahan summoned defendant to his office and told him that the police had investigated his alibi and his stories about the purchase of new clothing and found them to be false. “ Listen, Mr. Leyra,” he said, “ what is this? What is going on here? * * * Every time I seem to straighten you out, using a process of elimination * * * I just can’t seem to straighten you out on it.” He then left the room for a few minutes and, upon his return, defendant told him, “ Sit down here, Captain, just you and I. This thing will work itself out tonight.”
This initiated a discussion that was to continue through all of that night. Defendant remarked that he had had a “ bitter argument ” with his father on Sunday over the latter’s refusal to retire and turn his business over to him and Herrschaft and during the argument defendant had accused his father of having-killed his brother by overwork. Defendant then told Meenahan that he “ couldn’t think ” because of a severe sinus condition that had been bothering him and they talked for a while, over coffee and cigarettes, of defendant’s experiences in the army and of his work as a musician and a bartender. Occasionally, defendant would say “ I can remember about Pop but I can’t figure out Mom ” and “ if I could only clear the sinus condition, everything will come back. ’ ’
*205 At about 2 o’clock in the morning, Meenahan told defendant that “ a lot of men ” were outside “ waiting to go to work or waiting to go home ” and, in response to the query, “ What are we going to do here ”, defendant said, ££ You tell them men to go home * * *. This thing will work itself out, and when you do get it, it is going to be the truth.” They continued to talk, and at 4:00 a.m. the police officer showed defendant some photographs of the scene of the crime hoping that they would ££ refresh ” his memory. After defendant had looked at a picture of the kitchen for about 15 minutes, there was a flicker of recognition. Defendant commented on the absence of his father’s chair and the presence of the one at which he himself usually sat. ££ That chair ”, he stated, ££ it indicates that I was there.” This, according to Meenahan, is the balance of what he said:
“‘Definitely, I was there.’ He said, £I remember.’ He said, £ My mother asked me about the raincoat.[2] He said, £ She opened the door for me, ’ and he said,11 kidded her and I called her Teddy, and I kidded her about getting so slim, and she said, “ Come in and I will make you a cup of tea ”,’ and she called him in, and he said then she called bim ‘ Omadaum ’ ” [the Gaelic word for “ you big lug ”].
* * *
“ He said,£ I don’t remember how I got there. I remember her opening the door. I am certain I was there, Captain. I was there.’ He said, £ You know what that means, Captain. It means me. Who else could it be? ’
* * #
“ Then he went on telling me about how Mom wanted Pop to stay home from the office, and to let he and Herrschaft run the business; and, of course, he called her £ Teddy ’, and he kissed her, and he kidded her about getting slim; and that is about the substance of that. ’ ’
*206 As this resumé demonstrates, the evidence relied upon to spell out guilt is entirely circumstantial.[3] According to the well-settled principles applicable to such evidence, its sufficiency depends upon “ whether the proof points logically to defendant’s guilt and excludes to a moral certainty, every other reasonable hypothesis ”. (People v. Harris, 306 N. Y. 345, 351; see, also, e.g., People v. May, 290 N. Y. 369, 375; People v. Lewis, 275 N. Y. 33, 39.) Moreover, “ the facts from which the inferences are to be drawn must be established by direct proof: the inferences may not be based upon conjecture, supposition, suggestion, speculation or upon other inferences”. (People v. Weiss, 290 N. Y. 160, 163; see, also, e.g., People v. Taddio, 292 N. Y. 488, 489; People v. Woltering, 275 N. Y. 51, 59; People v. Razezicz, 206 N. Y. 249, 269-270.)
The prosecution places major reliance on defendant’s statements early Friday morning culminating in the exclamations, “ Definitely, I was there ” and “ You know what that means, Captain. It means me. Who else could it be? ” On the first appeal, the opinion refers to the statements in question as “ very damaging admissions ” (302 N. Y., at p. 358), but the court was not then, as we are now, called upon to assay their meaning dr their weight.
In attempting to evaluate those statements and educe what defendant could have meant by them, we may not overlook the significant fact that he had denied all guilt before he made them and that he persisted in his denials for many hours thereafter — until, indeed, he “ confessed,” some 15 or 16 hours later, under the skillful blandishments and subtle techniques of Dr. Helfand. Certainly, Leyra did not intend the statements as an acknowledgment or admission of guilt and, just as certainly, Meenahan did not so consider them; defendant continued, we note, long after he made them, to urge his innocence and Meenahan continued in his attempts to break him down and have him admit guilt.
Considered in context, the statement is too equivocal, too inconclusive, to warrant a finding of guilt. It is not an assertion of guilt, but rather the cry of one distracted and troubled, of *207 one floundering and confused, probing and seeking the answer to something not known. If anything emerges clearly from Meenahan’s entire- account of this interview, it is a picture of a defendant who is actually unable to recall with any clarity the events about which he is being questioned and who is straining his memory to the utmost. Defendant was a man plagued, we must remember, by a lack of sleep, an “ acutely painful attack of sinus ” (per Black, J., 347 U. S., at p. 559), incessant police questioning, the crumbling of his alibi and the shock of his parents’ murder. Who can say that all this had not produced a mental block as to the events of that Tuesday morning and a compulsion of sorts to give his interrogator some answers that might please him and justify letting his men “ go home ”.
The photograph of the kitchen, with a chair in the place where defendant customarily sat on his visits, seemed to awaken memory: “ That chair — it indicates that I was there.” “ I don’t remember how I got there. I remember her opening the door.” So far his recollection took him, but no further. “I was there ”, he said, but we are left in the dark as to what, if anything, happened after he got there, and we are not even certain that it was the memory of the morning of the murders, rather than some other visit, that the photograph evoked in defendant’s troubled and unsettled mind.
Then, the terrible implication of his possible presence struck him, and he exclaimed, “You know what that means, Captain. It means me. Who else could it be? ” On the appraisal and evaluation of the evidence that we are privileged to make in this capital case, we are forced to the conclusion that these few equivocal sentences are too weak and slender a reed upon which to support a judgment sending a man to the electric chair. What he said was no admission of guilt. He was merely giving voice to the train of reasoning that must have flashed through his mind at that point. If he was there, he must have done it, for “ Who else could it be? ” Like the entire tenor of the conversation, the statement is a searching and a questioning, not a declaration of guilt. The extreme artlessness of the language, with its obviously damaging overtones, suggests one probing the outposts of memory, rather than a man evasively revealing part and concealing the remainder of a story. Accordingly, it should not be read as a half-truth, to be amplified and extended by the jury into the further statement. “ I am the murderer.” *208 Indeed, defendant could just as well have been voicing the absurdity to which his reasoning had led him: “ I said I was there. If I was, it means I killed them; who else could it be. But I did not kill them. Therefore, I couldn’t have been there.”
Considered in proper perspective, as it was considered by the police captain at the time, as it was considered by the trial judge and the district attorney on the first two trials and on the appeals to this court, the statement reflected little more than a questing for the truth. And that is, we repeat, borne out by the fact that for many hours thereafter, until Dr. Helfand induced the “ confession,” he insisted that he was not guilty.
The prosecution contends, however, that there is sufficient additional evidence to dispel any uncertainty inherent in the statement to Meenahan and to sustain the verdict of guilt beyond a reasonable doubt. The further circumstances referred to are defendant’s allegedly fabricated alibi, the disappearance of his overcoat and his false explanation concerning the purchase of the new suit and shoes.[4]
The assertion of false explanations or alibis as well as the destruction or concealment of evidence comes within the broad category of conduct evidencing a “ consciousness of guilt ” and, therefore, admissible and relevant on the question of a defendant’s guilt. (See, e.g., 2 Wigmore on Evidence [3d ed., 1940], §§ 278-279, pp. 120-126; 1 Wharton’s Criminal Evidence [12th ed., 1955], §§ 207, 209, pp. 427-431; 3 Warren on Homicide, § 275, p. 263.) Such evidence may be sufficient to corroborate the testimony of an accomplice (see People v. Deitsch, 237 N. Y. 300, 303; People v. Gorski, 236 N. Y. 673; People v. McGuire, 135 N. Y. 639, 641; but cf. People v. Pignataro, 263 N. Y. 229, 234-235), but it is difficult to determine from the decisions the precise weight or value to be assigned to it, since it most often appears as only one of a number of items of proof. In many cases in which convictions have been upheld, the evidence indicating a consciousness of guilt has bolstered other circumstances which in and of themselves strongly pointed to the defendant’s *209 guilt. (See, e.g., People v. Conroy, 97 N. Y. 62, 80-81 [false statements]; People v. Johnson, 140 N. Y. 350 [false alibi]; People v. Driscoll, 107 N. Y. 414, 422 [false alibi and destruction of clothing]; Greenfield v. People, 85 N. Y. 75, 81 [destruction of clothing]; People v. Trombino, 238 App. Div. 61, affd. 262 N. Y. 689 [false alibi]; People v. Birnbaum, 208 App. Div. 476, 479 [false alibi]; People v. Rainier, 127 App. Div. 47 [false alibi].) On the other hand, in an equally large number of cases, convictions have been reversed despite evidence of false statements, false alibis or destruction of clothing. (See, e.g., People v. May, supra, 290 N. Y. 369, 372 [false statements]; People v. Pignataro, supra, 263 N. Y. 229, 234-235 [false alibi]; People v. Waltering, supra, 275 N. Y. 51 [destruction of clothing]; People v. Giordano, 213 N. Y. 575, 583 [false statements]; People v. Nowakowski, 221 App. Div. 521 [false alibi]; cf. People v. Russell, 266 N. Y. 147, 152-153.)
Naturally enough, the courts have consistently acknowledged the weakness of this type of evidence, reflecting a consciousness of guilt, where it is not supported by other proof of a truly substantial character. In an early case, Chief Justice Shaw of the high court of Massachusetts, after remarking that falsehood and suppression of evidence ‘ ‘ tend somewhat to prove consciousness of guilt, and, when proved, to exert an influence against the accused ”, went on to express Ms distrust of such evidence in a statement which has gained almost universal approval (Commonwealth v. Webster, 5 Cush. 295, 316-317):
“ But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs.”
The courts of this state, approving and amplifying that pronouncement, have recognized that the inference of consciousness of gmlt, though “ ‘ one of the simplest in human experience,’ may easily be pushed too far.” (People v. Nowakowski, supra, 221 App. Div. 521, 523; see People v. May, supra, 290 N. Y. 369, 373; People v. Reddy, 261 N. Y. 479, 486; see, also, Hickory v. United States, 160 U. S. 408, 417; 2 Wigmore, op. cit., § 278, p. 121.) And our court has held that evidence of fabrication or other evasive conduct may ‘ ‘ not serve as a substitute for other proof ” (People v. Giordano, supra, 213 N. Y. 575, 583), that *210 “ ‘ it operates ordinarily only by way of lending strength to other and more tangible evidenced (People v. Nowakowski, 221 App. Div. 521, 523; and see Commonwealth v. Webster, 5 Cush. 295, 317)”. (People v. May, supra, 290 N. Y. 369, 373.)
In the case before us, there is no “ other and more tangible ” evidence; there is only the equally vague and inconclusive statement that defendant made to Meenahan. (Compare statements made to police in People v. May, supra, 290 N. Y. 369, 372.) From that statement, and the evidence of defendant’s fabrication and the nondiscovery of his overcoat, the jury has been permitted to reason, through an impermissible series of uncertain inferences, to the remote fact of defendant’s guilt. (Cf. People v. Woltering, supra, 275 N. Y. 51, 59-60.) It may not be said that the proven facts “ exclude to a moral certainty every hypothesis except that of guilt ”; on the contrary, the controlling inference of guilt has been based upon “ conjecture, supposition, suggestion, speculation or upon other inferences ”. (People v. Weiss, supra, 290 N. Y. 160, 163.)
In the present case are to be seen the very dangers that have inspired judicial distrust of the type of evidence relied upon by the prosecution. Defendant, beleaguered by protracted questioning, suffering from a pain-ridden sinus and realizing that “ he was the number one suspect,” may well be the “ innocent man ” who resorted to deception “ when placed by circumstances in a condition of suspicion and danger ”. (Commonwealth v. Webster, supra, 5 Cush. 295, 317.) The prosecution has produced not a single trustworthy bit of affirmative, independent evidence connecting defendant with the crime; all of the evidence upon which it relies (except the nonappearance of the overcoat) has come from defendant’s own mouth, in the form of explanations which he could not back up and inconclusory “ admissions.” It may well be that the law enforcement officials, relying too heavily on the “ confessions ” that they had obtained through the efforts of Dr. Helfand, failed to do the essential careful and intensive investigatory work that should be done before a defendant is charged with crime, certainly with one as serious as murder. But, whether that is so or not, the fact is that in this case “ conjecture has filled the gaps left open by the evidence, and the presumption of innocence has yielded to a presumption of guilt." (People v. Galbo, 218 N. Y. 283, 294.) As we wrote in People v. Woltering, *211 supra (275 N. Y. 51, 61), “ by indulging in the same inferences that the jury has been permitted to draw, the court may feel defendant is guilty,” but such a feeling is a far cry from proof of guilt. To allow the conviction to stand, therefore, “ would violate principles which have stood the test of time and permit convictions where proof of guilt, in the accepted sense, is lacking.” (People v. Woltering, supra, 275 N. Y., at p. 61.)
The judgment should be reversed and the indictment dismissed.

. It is enough to note that on the second trial the court instructed the jury that, absent the confessions “ defendant must be acquitted, for the reason that the Court rules, as a matter of law, that all of the other evidence in the case * ** * even if accepted by the jury as true, is insufficient upon which to predicate a verdict of guilty ” (304 N. Y., at p. 473).

. This would certainly seem to cast doubt upon, if not destroy, the prosecution’s insistent contention that defendant had acquired a raincoat to replace the overcoat which he had been wearing when he committed the killings. If he actually had on a raincoat when his mother saw him, there could have been no subsequent concealment of an overcoat and, hence, no basis for inferring therefrom a consciousness of guilt.

. The circumstantial nature of the proof is not affected by defendant’s so-called “ admissions ” to Captain Meenahan, for the rule is that “ an extrajudicial admission by a defendant, not amounting to a confession because not directly acknowledging guilt * * * is circumstantial, not direct evidence.” (People v. Bretagna, 298 N. Y. 323, 326.)

. It is pertinent to note that the trial court viewed this additional evidence, standing alone, as insufficient to warrant a conviction, instructing the jury that, if it rejected the “ admission ” as involuntary, it “ must acquit the defendant.” Our problem is somewhat different: it is to decide whether the additional evidence is sufficient when considered together with the statement to Meenahan, however slight the probative value of that statement may be.