■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HERMAN WAY, Appellant. — Judgment of the Supreme Court, New York County (Scott, J.), rendered August 4, 1981, convicting defendant, after a jury trial, of burglary in the first degree and robbery in the second degree and sentencing him to concurrent indeterminate terms of two to six years, affirmed. As the dissenting opinion states, defendant was convicted after a jury trial of burglary in the first degree and robbery in the second degree on the basis of circumstantial evidence. Although disagreeing with the conclusion reached in the dissenting opinion, we agree that it fairly sets forth the applicable rules of law. In light of the dissenting opinion's comprehensive factual recital, we deem it unnecessary to set forth a second detailed factual review other than to note, with respect, our view that the dissenting opinion's factual statement in some respects obscures the clear meaning of the testimony, omits facts clearly important to a balanced evaluation of what occurred, and presents as plausible inferences that do not appear to us to be so. We agree that the case is similar in significant respects to People v Cleague (22 NY2d 363). In our view, however, the evidence presented in this trial is significantly stronger than that presented in Cleague. From the testimony of Gladys Burgos that during the course of the robbery and while she was standing near the window through which the intruder had entered the apartment, she heard from outside the window a whistle, followed

by the words "Hurry up", and then saw the intruder look in the direction of the window, the jury could have reasonably concluded that there was an accomplice on the street outside the apartment. From the testimony of Carlos Burgos the jury could reasonably have concluded that the defendant was that accomplice. Awakened by the conversation during the course of the robbery, Carlos Burgos had rapidly descended from a separate window onto an alleyway leading to the street, where he observed directly in front of the Burgos' apartment the defendant looking at the open window and looking up and down the street. Significantly, Carlos Burgos saw no one else on the street at that time. The thesis presented by the dissenting opinion as reasonably consistent with defendant's innocence involves the following suggested reconstruction of the events. After the intruder completed the robbery he left through the open window. Angel Burgos then dialed 911 to inform the police of the robbery, looked out the window and saw the intruder running in the direction of Morningside Park apparently pursued by a security guard and a security officer, and saw no one else on the street at that time. For some unspecified period of time he stopped looking out of the window, during which interval the defendant, whom Angel had not seen on the street during his period of observation, came to the sidewalk directly opposite the Burgos' apartment where he was then observed by Carlos in the manner described previously. We do not agree that the jury was required to accept this dubious hypothesis as a reasonable explanation of what occurred. When the testimony of Angel, Gladys and Carlos Burgos is considered in detail, with particular reference to what appears to have been the same words by Angel that alerted both Gladys and Carlos to the robbery ("Don't shoot, don't shoot" according to Gladys; "Don't fire, don't fire" according to Carlos), and when the testimony of Gladys and Angel Burgos describing the subsequent events of the robbery is compared with Carlos' account of his movements, the inference is very strong indeed that Carlos had come to the street and observed the defendant looking into the open window and in each direction on the street at a time when the intruder was still in the apartment. Indeed, from the totality of the evidence the jury could have found compelling the inference that it was the arrival of Carlos on the street, his observation of the defendant, and his running to secure assistance that elicited from the defendant the warning heard by Gladys, "Hurry up", and the defendant's own movement away from the area of the Burgos' apartment in an unsuccessful effort to secure a cab that would remove him from the scene. We are persuaded that when the evidence is considered as a whole, in detail, and realistically, it presented a factual issue for the jury which the jury was entitled to resolve as it did. Concur — Sandler, J. P., Fein and Milonas, JJ.

Markewich and Bloom, JJ., dissent in a memorandum by Bloom, J., as follows: Defendant was convicted, after a jury trial, of burglary in the first degree and robbery in the second degree and sentenced to a term of imprisonment. We think that the evidence, which was wholly circumstantial, was insufficient to justify a finding of guilt beyond a reasonable doubt. Accordingly, we would reverse and dismiss the indictment. The testimony indicated that Angel Burgos was the superintendent of premises 414 West 121st Street, New York City. Angel resided in apartment 1 in the building together with his wife Gladys, his two children and his brother Carlos. Because of the slope of the street between Morningside Drive and Amsterdam Avenue, the fire escape to the apartment, which was flush with the windowsill to one of the windows in the living room, was some 12 feet from street level. We are told that the early morning of August 8, 1980 was extremely warm. Because of the weather, all the windows fronting on 121st Street — two in the living room and one in the front bedroom — were opened halfway. Gladys was sleeping in the front

bedroom, Angel was sleeping on the living room floor and Carlos and one of the Burgos children were sleeping in the back bedroom. At or about 1 o'clock in the morning Angel was awakened by an armed prowler in the room. The prowler demanded money and threatened to shoot Angel. Angel gave him $12. The prowler demanded more and, when Angel informed him that he had no more, searched Angel's trousers. Gladys, who had been awakened by the disturbance, came into the living room. She appraised the situation and confirmed her husband's statement that there was no more money to be had and pleaded with the burglar not to shoot her husband. She testified that while this was taking place she heard a whistle and a male voice cry out "Hurry up". Angel, who was standing some three or four feet away, heard neither the whistle nor the voice. The burglar ordered both Angel and Gladys into the bedroom where he directed both of them to lie down on the floor. He then examined the contents of Gladys' cosmetics bag. When this produced nothing to his liking, he proceeded back into the living room and left, presumably through the open fire escape window. After the burglar had left, Angel proceeded to the phone in the dining area and called 911. He then went to the living room window from which he saw the burglar fleeing toward Morningside Drive pursued by a Teachers' College security guard and a security officer from the Morningside patrol. The burglar was never caught and the assumption is that he disappeared into the safety of Morningside Park. Angel further testified that when he peered through the window he saw no one in the street other than the burglar, the security men, his brother and his two sons. Meanwhile Carlos had been awakened by the commotion in the living room. Fearful that his entry into the living room might so disconcert the burglar that he might start shooting, Carlos dropped from the rear bedroom window into the yard, ran through the alley leading to a metal gate fronting on the street and exited onto the street at a point some 10 to 15 feet from the fire escape leading to the Burgos' apartment. Standing in front of the fire escape was a man, later identified as defendant, looking "upward and downward". When asked to explain the phrase he stated that the man looked first toward Morningside Drive and then toward Amsterdam Avenue. Carlos ran toward Amsterdam Avenue. He saw two members of the Morningside security patrol standing on the west side of Amsterdam Avenue and ran to them. While explaining to them what had transpired he observed defendant, who was walking west on 121st Street. When defendant reached Amsterdam Avenue, he crossed to the west side of the avenue and hailed a passing taxicab proceeding south. After a very brief discussion with the car driver the taxi proceeded on its way and defendant continued to walk south. Police arrived as defendant approached the intersection of 120th Street. Carlos related the happenings of the early morning and the police proceeded with Carlos and the security guards to where defendant was and arrested him. The theory of the prosecution's case was that defendant was a "lookout" for the burglar and that it was he who whistled and called "Hurry up". There was no direct proof to support the prosecution's contention and it relies on the circumstances set forth to justify the verdict. It has long been the rule that: "In determining a question of fact from circumstantial evidence, there are two general rules to be observed: 1. The hypothesis of delinquency or guilt should flow naturally from the facts proved, and be consistent with them all. 2. The evidence must be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offence imputed to him or, in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence" (*People v Bennett*, 49 NY 137, 144-145; quoted by us in *People v Forestieri*, 87 AD2d 523, 524). The rule has been reiterated in recent years, although couched in

somewhat different language: " 'the facts from which the inference of the defendant's guilt is drawn must be established with certainty — they must be inconsistent with his innocence and must exclude to a moral certainty every other reasonable hypothesis' " (*People v Cleague,* 22 NY2d 363, 365-366, quoting from *People v Bearden,* 290 NY 478, 480; see, also, *People v Wachowicz,* 22 NY2d 369; *People v Borrero,* 26 NY2d 430; *People v Woltering,* 275 NY 51). "In the end, it is a question whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts" (*People v Wachowicz,* 22 NY2d 369, 372, *supra; People v Borrero,* 26 NY2d 430, 435, *supra*). Giving the prosecution the most favorable interpretation of the evidence (*People v Montanez,* 41 NY2d 53, 57; *People v Benzinger,* 36 NY2d 29, 32), and assuming that the facts testified to both by Gladys and Carlos were established with certainty, what we have here is proof that during the course of the burglary someone in the street adjacent to the Burgos' apartment whistled and called out "Hurry up". The record is devoid of any time sequence. Nevertheless, coupling the testimony of Angel that when he looked out the living room window he saw someone, presumptively the burglar, fleeing toward Morningside Drive, but no one else, and the testimony of Carlos that when he appeared on the street he saw only the defendant and the two security men standing at Amsterdam Avenue and 121st Street, the conclusion that Carlos arrived on the street after the burglar had turned the corner of Morningside Drive and disappeared presumptively into the safety of Morningside Park, is a correct one. At that time, the defendant was seen some two and one-half feet away from the fire escape looking "upward and downward", i.e., toward Morningside Drive and Amsterdam Avenue, a not unusual reaction for someone who had just seen someone exit onto a fire escape and drop into the street. We think this proof much too thin a reed to warrant the inference of guilt and to exclude to a moral certainty every reasonable hypothesis other than that of guilt. In many respects the situation presented in *Cleague* was considerably stronger for conviction than that at bar. The defendant was observed looking up and down the street outside a used car lot. On two occasions Cleague was observed to walk to a wooden shed which housed the office of the lot. A police officer stopped and questioned him. Cleague responded that he was looking at cars. During the questioning the officer noted a "shadow" in the office. The officer entered the office and arrested one Brown. Both were charged with burglary and larceny. There, as here, the theory of the prosecution was that Cleague was a lookout and by reason of his accessorial conduct was equally guilty with Brown. In holding that Cleague's guilt had not been established the Court of Appeals noted (p 368) that: "[T]he inferences to be drawn from the coincidence of time, place, and behavior are sufficient only to create suspicion. Consequently, defendant's guilt has not been established to a certainty, nor is the evidence as a whole inconsistent with defendant's innocence, excluding to a moral certainty every other reasonable hypothesis". The only possible distinction between *Cleague* and the case at bar is that Cleague testified and presented to the jury the same explanation which he had given to the police officer. Here, defendant did not take the stand. However, we are not persuaded that Cleague's explanation was more convincing than defendant's silence. Moreover, we are aware that whether or not a defendant shall take the witness stand is almost invariably a matter of defense strategy frequently controlled by defense counsel's evaluation of the People's case. In sum, we find the coincidence of time and place insufficient to establish defendant's guilt to a moral certainty and to exclude any hypothesis of innocence. Accordingly, we would reverse the conviction and dismiss the indictment.